194 A.2d 50 (1963)
David LEVIN, Morris Segal and Doris S. Segal, Petitioners,
v.
MIDLAND-ROSS CORPORATION, an Ohio corporation, Respondent.
William J. LYNCH, Petitioner,
v.
MIDLAND-ROSS CORPORATION, an Ohio corporation, Respondent.
Court of Chancery of Delaware, New Castle County.
August 30, 1963.
*51 Samuel R. Russell, of Herrmann, Bayard, Brill & Russell, Wilmington, for petitioners David Levin, Morris Segal, Doris S. Segal and certain other claimants.
John J. De Luca and Joseph A. Julian, Jr., Wilmington, for petitioner William J. Lynch.
Aaron Finger, of Richards, Layton & Finger, Wilmington, and John B. Houck, of Jones, Day, Cockley & Reavis, Cleveland, Ohio, for respondent.
MARVEL, Vice Chancellor.
Petitioners in the above consolidated action were stockholders of Industrial Rayon Corporation on April 28, 1961, the effective date of the merger of their corporation with Midland-Ross Corporation. As such they have resorted to the provisions of 8 Del.C. § 262 for the purpose of dissenting from the now accomplished merger and obtaining payment of what they claim to be the value of their shares of stock as of the date of merger. Exceptions have been filed to the report of the appraiser by petitioners and respondent and this is the decision of the Court on such exceptions. The rights of certain other stockholders who have complied with the statute but who have not filed briefs will be determined by the results herein reached.
Industrial Rayon Corporation was incorporated on July 20, 1925 and since its merger with Midland-Ross on April 28, *52 1961 its business has been carried on under the name of Industrial Rayon Division of Midland-Ross Corporation. During the years in issue, namely the ten year period of 1951 to 1961, Industrial Rayon's production was divided between the manufacture of a type of tough rayon cord used primarily in the manufacture of tires for motor vehicles and the making of ordinary rayon yarn for clothes. However, production of rayon tire cord was Industrial Rayon's principal business.
Total American production of high tenacity rayon cord rose rapidly during the years 1936 to 1953, a period during which such material was used in increasingly larger amount in the manufacture of pneumatic tires. However, with the introduction of nylon and other synthetic tire cords during the early 1950's demand for rayon tires, particularly in the replacement market, slackened. In short, since 1953, total production of high tenacity yarn demonstrated a pronounced if erratic decline, and by 1960 only 64% of all tire cord was being made of rayon. It is significant, however, that as recently as 1960 rayon cord tires were original equipment on most new automobiles due no doubt to the fact that they are less expensive than nylon tires.
Faced with the fact that nylon would, however, possibly pre-empt the tire market in the long run and that their own business was already suffering from overproduction, a concerted effort was made in 1958 by producers of rayon tire cord to develop a product that could compete favorably with nylon. However, notwithstanding the development of an improved tire cord known as Tyrex, nylon continued to take over an increasingly larger part of the tire market. In short, by the early part of 1961, the future of the rayon tire cord industry was definitely clouded.
In addition to the production of high tenacity tire cord, which accounted for 75% of Industrial Rayon's total output from 1951 through 1960, such corporation also engaged in the business of producing ordinary textile yarns, a field in which such corporation continued to lose business to its competitors during this same period. This latter fact when coupled with general conditions in the business made it essential that some means be found to derive greater net earnings for Industrial Rayon's stockholders.
The productive capacity of all manufacturers of rayon yarn reached a peak in 1953. Thereafter, as the demand for rayon yarn decreased, economic pressures led to a gradual closing down of plant facilities. In the economic struggle for survival thereafter ensuing Industrial Rayon was the only producer during this period to operate at a net loss, its net income dropping more drastically than its sales. After earning a peak net income of $10,700,000 in 1955, Industrial Rayon reported a loss of $3,100,000 in 1958 and a $3,300,000 loss in 1960, a temporary recovery having been made in 1959 when a profit of $800,000 was earned. As a result dividends on Industrial Rayon's common stock were reduced from $3.00 per share in 1956 to $1.75 in 1957. From 1957 to the date of merger Industrial Rayon's stockholders received no dividends whatsoever.
The board of directors of Industrial Rayon thereupon took steps to counter this downward trend by eliminating waste and by reorganizing. By the end of 1960 the board had succeeded in selling the plant at Covington, Virginia and has also closed its Cleveland plant. Thereafter, manufacturing was confined to the Painesville, Ohio plant. Steps were simultaneously taken to cut research and development expenses and to sell off unneeded assets including excess inventory. Appraisals of unused facilities and land were obtained but a number of such properties remained unsold at the time of the merger.
Such reorganization and elimination of unprofitable operations put the company in a position of extreme and controversial liquidity on the eve of merger, leading petitioners to assert claims in this proceeding *53 more appropriate to a true liquidation proceeding. On April 27, 1961, immediately prior to the effective date of the merger, almost one half of the assets of Industrial Rayon had been liquidated, and it is this condition of unusual liquidity that has engendered much of the controversy between the parties as to the proper method under Delaware law of appraising the value of the corporation's common stock, there being no other corporate securities outstanding senior to such stock.
The parties agree on the basic principles which govern the valuation of a dissenter's stock in proceedings based on Title 8 Del.C. § 262. Thus both sides cite Tri-Continental Corporation v. Battye, 31 Del.Ch. 523, 74 A.2d 71, in which the Supreme Court of Delaware stated:
"The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value."
It is also conceded that the three elements of value considered by the appraiser are generally given major consideration in proceedings such as this, namely market value, asset value, and earnings value. No dividends having been paid since 1957, they have, of course, been disregarded as a factor and no other relevant factors have been suggested.
The appraiser found that an active market for shares of Industrial Rayon had existed during the year prior to April 28, 1961, the effective date of the merger, and assigned to petitioners' stock a market value of $18.69 per share, the mean market price on the day the merger was announced, a price which he necessarily found to be uninfluenced by the merger, as the statute requires, 8 Del.C. § 262(b).
Certain of the petitioners object to considering market value as an independent value factor in this case, contending that there was an inadequate and tardy disclosure of vital information to which the stockholders and the public in general were entitled in order to make an intelligent appraisal of the stock. In my opinion the record fails to sustain such contention and objections in such regard are overruled. There was obviously a vigorous market for Industrial Rayon shares in the period preceding the merger, and, in my opinion, stockholders were adequately informed about the problems facing management as well as the steps being taken to cope with the situation, namely, a plant shut-down, the disposal of other unproductive facilities, and a policy of building up largely uninvested liquid assets.
Next, it is contended by other petitioners that while market value is a factor to be considered, a market price other than the one selected by the appraiser should have been used, it being contended by one petitioner that a date in December 1959 should have been selected and by another that a ten year average should be used. I find no merit in such contentions and they are hereby overruled. The appraiser quite properly accepted the views of respondent's expert that the average of prices on the last trading day preceding the announcement of the merger reflected a fair market price *54 and constituted compliance with the statute. Reserving for the time being the question of the weight to be attributed to market value, I conclude that the appraiser properly selected a market price of $18.69 for the purposes of this proceeding.
The next factor considered by the appraiser was asset value which he fixed at $35.67 per share. Here the parties accept the values assigned by him to the company's substantial amounts of current assets as well as to its sizable tax loss carry forward. They differ, however, in their views on the manner in which the appraiser treated Industrial Rayon's physical assets. The appraiser divided such assets into two classes: (a) assets no longer necessary for the operation of the business, and (b) assets necessary for the operation of the Painesville plant. Midland-Ross, however, takes exception to certain of the appraiser's findings under category (b) above. Category (b) contains a total of eight separate items. Two such items were valued on the basis of a physical appraisal and Midland-Ross raises no objection with respect to these items. The remaining six items, however, were taken at their book values by the appraiser, and it is this method of valuation which Midland-Ross says was in error.
At the hearing before the appraiser no evidence was presented as to the actual current value of the items in dispute although an estimate of their liquidation value was submitted. Respondent's expert approached the problem by first comparing the book value of the assets with appraised market value and capitalized value. He concluded that the latter two figures were substantially less than the book value of these facilities and that the final assigned asset value must accordingly be less than book value. He therefore selected and ultimately used what he admitted was an arbitrary figure, namely one half of book value.
The appraiser declined so to adjust the book values of these items. First, he decided that an appraised or liquidated value should not be applied even as a guide because such assets had a definite value to a going concern but little value in liquidation. Next, he declined to apply a capitalized earnings test. He concluded therefore that he must accept either the book value or the liquidation value of these items. Having determined that the book valuation was if anything on the low side, he determined to apply it.
Though the matter is not wholly free from doubt, I have concluded that the appraiser's findings in such regard should not be overturned. In Heller v. Munsingwear, Inc., 33 Del.Ch. 593, 98 A.2d 774, the Chancellor made it clear that the figure selected should reflect present asset value as nearly as possible, since "* * * that is what the stockholder is entitled to have considered in arriving at the going concern value of his stock * * *", and he apparently refused to apply depreciated original cost in that case because under the circumstances there present such figures would not have accurately represented present asset value. In the case at bar, however, the appraiser definitely based his findings on book value. He rejected the application of a capitalized earnings test, and his conclusion in this regard would appear to be supported by Felder v. Anderson, Clayton & Co., Del.Ch., 159 A.2d 278. In that case the Chancellor also determined that liquidation or sales value should not be used in arriving at asset value since this would be contrary to the main purpose of a proceeding such as this which is to find the going concern value of assets to the company whose shares are being appraised.
The appraiser, having apparently concluded that the book value of the assets in question had been so depreciated that in all probability they were below their current value to Industrial Rayon as a going concern and in effect represented a floor for going concern value, adopted such valuation in the absence of better proof. I adopt the appraiser's approach to the problem notwithstanding the weaknesses usually inherent in reliance on book value. The *55 arbitrary reduction of book value by one half, as suggested by respondent's expert, does not, in my opinion, provide a more equitable solution. Finally, the obsolescence factor arising out of the unfavorable outlook for the industry can be more appropriately considered when a determination is made as to the proper multiplier to be applied in computing earnings value.
At the time of the merger Industrial Rayon owned certain emergency facilities which had been fully amortized on its books, and these must be briefly considered. The appraiser agreed with petitioners' contentions that such facilities had a normal useful life of about twenty four years and that since they had been written off over a shorter period, certain amounts less tax benefits should be restored to book in order to reflect their remaining value. Respondent takes issue with this conclusion and claims that there is no evidence that these items were then in use or otherwise had value. Respondent says that the estimate of a useful life of twenty four years for such properties is purely hypothetical and is not based on an actual appraisal. Therefore it contends, citing Jacques Coe & Co. v. Minneapolis Moline Co., 31 Del.Ch. 368, 75 A.2d 244, that no value may be assigned to such facilities for appraisal purposes.
In his final report, after referring to Jacques Coe & Co. v. Minneapolis Moline Co., the appraiser stated his conclusion as follows:
"Nowhere in the record do respondents deny petitioners' assertion as to the value of these facilities. They appear as an addendum to PX 24 and are discussed briefly on the record at R 87. The addendum shows conclusively petitioners' suggestions as to life expectancy and normal rate of depreciation. These figures were not questioned nor was any cross examination directed to this item. I, therefore, must find that these items were in use and of real value. If the situation had been otherwise respondents would have been quick to point this out."
I think it clear from the foregoing that petitioners treated their proffered exhibit as an affirmation by them that the facilities were in use and had value and that the appraiser proceeded on that assumption. The appraiser, as indicated, concluded that the respondent failed to prove otherwise. I see no reason to disturb his findings and they will be adopted.
Turning to the earnings valuation of Industrial Rayon, it appears that none of the parties takes exception to the appraiser's finding that the prospective earnings of the Painesville operation for appraisal purposes were about $1.00 per share at the time of the merger. Similarly, the parties agree that as of such time the earnings from Industrial Rayon's investments amounted to $.26 per share. There is, however, disagreement as to the proper method of capitalizing such income.
Respondent says that the two stated sources of corporate income should be lumped together and an appropriate multiplier applied. The appraiser adopted this approach, and having made reference to Dewing's "The Financial Policy of Corporations," determined that Industrial Rayon should be capitalized at seven times total corporate earnings.
Petitioners object to the appraiser's choice. First, they contend that Industrial Rayon presented an unusual situation at the time of merger in that a substantial portion of the total assets of the corporation not necessary to or utilized in the Painesville operation were, as noted above, in a highly liquid state. Petitioners therefore contend that for appraisal purposes the income of the corporation should be divided as to source, namely that the part derived from its manufacturing operations and that arising out of investment be treated separately.
Petitioners contend that the earnings value of a corporation in Industrial Rayon's unique situation consists of the capitalized value of its manufacturing operations (determined by using accepted statistics on *56 average price-earnings ratios) added to the actual dollar value of its so-called unneeded assets. Petitioners go on to argue that prospective earnings attributable to the plant operating at Painesville should be capitalized at twelve times earnings rather than at seven times and that the earnings from investments should not be formally capitalized at all. Petitioners further say that the full dollar value of these so-called unneeded assets should be applied here rather than their capitalized value because only a small part of such assets were being used by Industrial Rayon to earn income at the time of merger. The point is, however, that we are concerned with an appraisal proceeding and not a liquidation and assets must be viewed in a proceeding such as this as they actually exist. The record clearly indicates that the board of directors had determined such assets at the time of the merger should not be invested, and as there is no showing that their retention in such form was improper, this Court should not treat them differently. On this point it should be noted that the appraiser was of the opinion that the corporation's investment policy would not have been substantially altered had the merger with Midland-Ross not occurred. He therefore concluded that earnings from corporation investments would continue at a low level.
In my opinion, the appraiser did not commit error in refusing to treat the two sources of corporate income here involved separately and in declining to take so-called unneeded assets at their full dollar value. In In re General Realty and Utilities Corporation, 29 Del.Ch. 480, 52 A.2d 6, a case in which about one third of the corporation's assets were cash and two thirds marketable New York real estate at the time of merger, the Court relying heavily on the classic case of Chicago Corporation v. Munds, 20 Del.Ch. 142, 172 A. 452, quoted from Application of Behrens, Sup., 61 N.Y.S.2d 179, as follows: "* * * it must be remembered that an appraisal is not a liquidation, and that the stock must be appraised on a going concern basis * * * with the possibility in different cases that the value of the stock may be substantially above or below net asset or break-up value."
Petitioners submit, however, that in any event for earnings value purposes the value attributable to so-called unneeded assets should be $23.06 per share on the theory that the so-called total value of such assets was $42,600,000. Of this amount, however, only $37,200,000 admittedly represented excess current assets, the balance consisting of unused land and machinery and a tax loss carry forward of $2,500,000. The full value of this latter item could have been realized, of course, only when Industrial Rayon had sufficient income against which the loss could be charged. No convincing authority is advanced for these contentions. Accordingly, the approach adopted by the appraiser will be followed here.
I now consider petitioners' contentions concerning an appropriate multiplier to be applied to Industrial Rayon's earnings. Petitioners select a multiplier of twelve by taking the price to earnings ratio found in Standard & Poor's national stock averages and testing such figures against the similar ratio for the rayon textile and cord industry. The Standard and Poor national price-earnings ratio average on April 27, 1961 was about 20.2. In the rayon textile and cord industry the ratio at the same time averaged between 12 and 14. Petitioners contend that a multiplier of 12 is accordingly justified with respect to the business here involved.
Against the background of a clouded future for rayon tire cord generally Industrial Rayon's declining position in the industry during the years immediately preceding the merger can not be minimized. Industrial Rayon was the only rayon producer to operate at a loss in the decade of 1951-1961, and this overriding fact, in my opinion, definitely excludes it from the high multiplier category in which petitioners' expert sought to place it.
*57 The appraiser determined that the figure of $1.00 per share for earnings in manufacturing operations was optimistic and not indicative of so-called normalized earnings. Respondent's expert, on the other hand, calculated that the maximum average annual earning potential of Industrial Rayon on April 27, 1961, based on past earnings, was $.99 per share, and while petitioners' expert also arrived at an estimate of an earnings figure of $1.00 per share, his estimate was based principally on long-range projections, a technique which has not met with approval in Delaware in proceedings having to do with the determination of the present value of assets. Compare Marks v. Wolfson, Del.Ch., 188 A.2d 680. I accordingly conclude in the light of the condition of the rayon business in general and Industrial Rayon's situation in particular that the capitalization rate of seven time earnings applied by the appraiser was proper, and I therefore adopt such rate. In my opinion, the description of an industry classed by Mr. Dewing as No. 3 on page 390 of his treatise (1953 ed.) entitled "The Financial Policy of Corporations" fits Industrial Rayon's situation at the time of merger.
"3. Businesses, well established, but involving possible loss in consequence of shifts of general economic conditions. They are strong, well established businesses, but they produce a type of commodity which makes them vulnerable to depressions. They require considerable managerial ability, but little special knowledge on the part of the executives  15%, a value approximately seven times the net earnings."
The appraiser weighted each of the value factors as follows:

 Value Element Value Per Share Weight Value
 Earnings Value (7 X 1.26) 8.82 X 20% $ 1.76
 Asset Value 35.67 X 60% 21.40
 Market Value 18.69 X 20% 3.74
 _______
 $26.90

Midland-Ross takes exception to the weighting of asset value at 60%, contending that such amounts to treating an appraisal proceeding as if it were a liquidation. It points out in support of such contention that in no previous Delaware case has a weighting of more than 50% for asset value or less than 25% for earnings value been applied.
Assuming that earnings value should ordinarily receive primary consideration in a proceeding such as this, was the appraiser justified in the present case in weighting asset value as he did? The appraiser noted that a proper valuation under the statute requires consideration of all of the circumstances peculiar to the subject corporation. Here, we are confronted with a corporation having in its possession an unusually large percentage of assets which were not being utilized in its manufacturing operations. The appraiser found that such assets amounted to $42,600,000, making up approximately 64.5% of all the assets of the corporation. Of these, as noted above, $30,900,000, or about $16.70 per share, represented excess liquid items. The appraiser concluded accordingly that the intrinsic value of the stock of Industrial Rayon rested in large part on its possession of these assets and only to a lesser extent on its ability to generate income from operations.
I am persuaded that because of the unusual asset situation here present that the appraiser's conclusion on the weighting of *58 asset value should not be substantially altered. Even though excess assets had been generating relatively small earnings, nevertheless they were clearly entitled to considerable weight in the ultimate valuation of the stock in question, although it is true, of course, that a non-productive dollar asset is worth less than a full dollar. However, I think that this discount factor was properly taken into account by the appraiser, he having capitalized such assets at a low rate in determining earnings value. Secondly, even though the board did not contemplate a distribution of so-called unneeded assets, there is no suggestion in the record that the corporation faced the threat of further operational losses after the reduction of excess productive capacity. Furthermore, since a substantial part of these so-called unneeded assets had already been reduced to a liquid state at the time of the merger, no great uncertainty can be said to have existed as to the ability of the corporation to realize their full value. Viewed objectively, if earnings value were given a maximum weight of 50%, the value of the stock in question would be reduced to $17.30 per share, notwithstanding the presence of $16.70 per share in excess liquid items and over $6.00 per share in other so-called unneeded assets to which must also be added the value of the productive facilities at Painesville. Such an approach would, I think, give undue emphasis to corporate earnings and earnings value under circumstances in which the principal factor in the value of the stock was undoubtedly the exceptionally strong asset position of the corporation. I conclude therefore that the appraiser's high weighting of asset value was basically correct. It will, however, principally because of the Delaware precedents on this subject, be reduced from 60% to 50%. Earnings will be weighted at 25%, and market value, an obviously significant and meaningful guide for determining fair value for the stock here in issue, will also be weighted at 25%. Therefore, on the basis of the appraiser's component values, which are adopted, petitioners' stock is found to have a value for the purposes of this proceeding of $24.71 per share. Decision on certain other issues raised in this proceeding will be reserved pending argument.
Order on notice.