206 A.2d 664 (1965)
Application of DELAWARE RACING ASSOCIATION, a corporation of the State of Delaware, for a determination, pursuant to Section 262 of the General Corporation Law of the value of certain shares of stock of The Delaware Steeplechase and Race Association.
Court of Chancery of Delaware, New Castle County.
January 20, 1965.
*665 William S. Potter and Charles S. Crompton, Jr., of Berl, Potter & Anderson, Wilmington, for petitioner.
Vincent A. Theisen and Aubrey B. Lank, of Theisen & Lank, Wilmington, for the objecting stockholders.
MARVEL, Vice Chancellor.
On July 31, 1963, Delaware Steeplechase and Race Association was merged into Delaware Racing Association after the latter had become the holder of 1390 of the 1519 shares of the former issued and outstanding immediately prior to such merger. As the holder of at least 90% of the outstanding shares of its subsidiary Delaware Racing Association was able to accomplish the summary absorption of such subsidiary under the provisions of Title 8 Del.C. § 253, leaving objecting holders to the valuation rights afforded them in 8 Del.C. § 262(d) to (j).
On December 21, 1963, the Court having determined that a total of 77 shares out of the 1519 shares of common stock of Delaware Steeplechase outstanding at the time of the merger were entitled to valuation under the statute, an appraiser was appointed. Such common shares represented the only class of securities of the merged corporation outstanding as of the date of the merger, its mortgage bonds in the amount of $400,000 having been fully paid up in 1945, and its preferred stock having been retired in 1953. The appraiser conducted a hearing, considered the contentions of opposing counsel and filed his report on November 4, 1964. Both the resulting corporation and the objecting stockholders have filed exceptions to such report, and this is the opinion of the Court as to the intrinsic value of the stock held by those stockholders entitled to payment therefor determined under the provisions of Title 8 Del.C. § 262(f).
With the exception of the year 1943, Delaware Steeplechase and Race Association conducted thoroughbred flat racing on one or more racing strips at Stanton, Delaware, from the summer of 1937 until the merger date of July 31, 1963, and in most of these years it also scheduled and ran brush races over grass. During this period on-track betting was carried on, with a percentage of the pool going to the State in the form of a tax. From the beginning, the promoters of Delaware Park have taken the position that the primary purpose of their track was to provide good racing rather than to enrich investors in the enterprise.
The operation of such a racing establishment became lawful only after the Constitution of Delaware had been amended in 1935 to except pari-mutuel wagering, carried on within the enclosure of a licensed race meet for horses, from the general prohibition against gambling imposed by constitutional Article 2, § 17, Del. C.Ann. Thereafter, a previously created Racing Commission was granted express statutory authority over the carrying on of horse racing for purses or stakes (other than racing conducted by an Agricultural Fair Association) under a chapter (Title 28 Del.C. Ch. 3) which closely circumscribes the conduct of such sport, requiring that it be carried on by no one other than the holder of a license issued by the Commission. Such a licensee in turn is closely regulated, being required to maintain a track of a minimum circumference of one mile and to comply with the reasonable rules and regulations of both the Jockey Club and the National Steeple Chase and Hunt Association. In addition to being granted control over the actual conduct of racing, the Commission was also granted authority to regulate all charges made by a licensee as well as the rights inter alia: (a) to pass on the desirability of all proposed physical additions to a racing establishment; (b) to examine under subpoena and to supervise the keeping of a licensee's books and records, and (c) to require the removal of any employee or official employed by a licensee. Other statutory provisions having to do with the *666 financial affairs of a licensee require inter alia that a full statement of receipts and expenses be made to the Commission annually, and permit a licensee with Commission approval to deduct improvements as running expenses. Also permitted was the accumulation of reasonable annual depreciation on buildings and equipment for the retirement of funded debt and preferred stock. Out of net revenue, the Commission was authorized to allow a licensee:
"* * * a sum not to exceed 4 per cent of the capital investment of the licensee in his or its track, grandstand and equipment employed in holding racing meets as return on such investment. All net revenue * * * remaining shall be set aside and employed by the licensee for working capital, for the retirement of outstanding debt or preferred stock, or both, for the maintenance and development of purses, stakes and rewards, and for the maintenance and improvement of the tracks and buildings of the licensee. * * *" 28 Del.C. § 329(c).
To make the licensing of racing profitable to the State, a tax was provided for based on a percentage of the pool created by the pari-mutuel betting permitted within a licensee's enclosure. Also provided for was a similar percentage to a licensee, including a so-called restricted 1― percent of pari-mutuel pools, the total now allowed a licensee being 7― percent of such pools. The particular section providing for the 1― percent restricted fund, namely 366(c), specifically states that any portion of this latter percentage, not required to be applied to the retirement or redemption of any funded debt and shares of stock, may, in the discretion of the licensee, be applied:
"* * * first to any operating deficits of the current or preceding fiscal years; second, to any improvements in the racing plant required by the Commission; and thereafter to any one or more of the following purposes, without order of preference, viz:
"Any other improvements to the racing plant; suitable monetary rewards for the breeders of winning horses at the racing plant; stakes or purses for races at the racing plant; or a suitable reserve fund for any of the above 5 purposes in this section set forth."
To date Delaware Steeplechase and Racing Association and its successor have been the only holders of a Commission license to run thoroughbred races at which parimutuel betting is permitted.
The appraiser fixed asset value at $5,996 a share, weighting such value at 40%. He placed a market value of $1,530 on each share, weighting such value at 25%. He established earnings value at $2,768 also with a weight of 25%. Finally, having given a 10% weighting of zero to dividend value, the appraiser concluded that the intrinsic value of the common stock of Delaware Steeplechase, found pursuant to the provisions of 8 Del.C. § 262 and precedents thereunder, was $3,472.90 per share. The appraiser gave significant consideration to what he deemed to be a bona fide market for the merged corporation's stock at the time of the merger at a price which had been independently given force by a study submitted by Standard Research Consultants. He gave substantial consideration to what petitioner agrees was the value of the merged corporation's assets, and, applying an extremely high multiplier to earnings value on the theory that a corporation operating under rigid governmental supervision was of the nature of a public utility, the appraiser gave greater emphasis to earnings value than would otherwise have been the case.
The resulting corporation contends that the correct intrinsic value of each share of the objecting stockholders is in fact $1,932.12, while objectants take the position that such statutory value should be found to be *667 $7,949.20 per share. Petitioner, as noted above, agrees with the appraiser's proposed asset value of $5,996.00 per share, but contends it should be weighted at 20%. It places market value at $1,305 on the grounds that the appraiser improperly failed to take into consideration Standard Research's finding that the common stock here involved had a "* * * fair market value * *" of $1,450 per share discounted 10% "* * * for lack of marketability * * *", as of the date of merger, a falling off attributable, in part, to a decline of earnings in 1962 and an indication of an operating loss in 1963. Also considered in such report were competition and the factors of obsolescence at Delaware Park, which, it is submitted, hinder remedial steps to overcome declining earnings attributable to competition. For instance, assuming an even greater number of racing days could be obtained, there would appear to be some doubt as to whether or not earnings would thereby be substantially affected. A weighting of 40% is urged for such reconstructed market value, because a sale was the most likely way that an investor might have realized on his investments, Tri-Continental Corp. v. Battye, 31 Del.Ch. 523, 74 A.2d 71. Next, petitioner contends that the five-year period used by the appraiser for average earnings improperly excluded figures for 1963, Tri-Continental Corp. v. Battye, supra, and included figures for 1958, the first year of a long race meeting and the year before indebtedness of $3,800,000 was incurred to build a new clubhouse. According to petitioner, the 1958 earnings having been influenced by an unusual factor, they should be disregarded, Adams v. R. C. Williams & Co., 39 Del.Ch. 61, 158 A.2d 797. Petitioner also argues that the appraiser misused Standard Research's multiplier of 15.2 when he applied it to average earnings without making the concomitant adjustments made in Standard's report and that he also erred in likening the corporation to a public utility entitled to an abnormally high multiplier of earnings. According to petitioner, the appraiser overlooked the fact that an exclusive franchise for the operation of a track in the racing area here involved was not and could not be granted, nor was the licensee assured a guaranteed fair return on investment. In fact, competition by other nearby thoroughbred tracks as well as trotting tracks is a factor to be reckoned with in the present and future of racing at Delaware Park. Finally, petitioner, while in agreement with the appraiser's recognition that dividends can not be a positive factor in arriving at going concern value and so should be weighted at zero, charges that the appraisal fails to give substantial negative recognition to such factor, Adams v. R. C. Williams & Co., Feb. 21, 1961 (Del. Ch. Memorandum Opinion). According to petitioner, this failure is magnified because the appraiser, having used book earnings, ignored what petitioner claims is a downward trend in such earnings, a deficit being allegedly indicated were the 1― percent restricted fund not available.
The objecting stockholders attack the appraiser's conclusions on a number of grounds. First of all, they point out that inasmuch as the merger was accomplished under the provisions of Title 8, § 253, the result was a denial of any option to continue as stockholders in the resulting corporation. However, § 253 provides that an objecting stockholder in a merger carried out under its terms "* * * may file a petition in the Court of Chancery as provided in paragraph (c) of section 262 * * * and thereupon the parties shall have the rights and duties and follow the procedure set forth in paragraphs (d) to (j), inclusive, of section 262 * * *". It should also be noted that § 252 provides for the payment of cash as well as securities to an objecting stockholder. I conclude that there is no doubt but that not only the provisions of § 262 but the cases decided thereunder must be considered in determining objectants' rights.
Objectants next contend that the appraiser gave undue emphasis to what they consider an erroneous official view that § *668 329(c) is a statutory restriction which limits the fund for dividends on the common stock to the amount of the original capital investment paid in by such stockholders. However, it appears that the Commission, until at least November, 1962 (PX1), has taken the further position that no fund has existed for the payment of dividends because of the necessity of first retiring the corporation's funded debt and preferred stock and thereafter a clubhouse loan. Furthermore, the record is silent as to any action taken to test either the meaning of the 4% provision, the legality of the Commission's general position, or the so-called non-profit policy of track management. Finally, the record on the whole indicates that what was in 1937 an attractive rural track conveniently accessible by rail as well as by road, which, until World War II, drew a large percentage of out-of-state patrons, is not keeping pace with other nearby tracks in attracting what might be called its fair share of business from the increasingly more densely populated environs.
Next, the objecting stockholders charge that the market price of $1,530 per share chosen by the appraiser is in fact an artificial price created by Mr. William duPont, Jr.'s offer of April 26, 1962, which was admittedly based on the Standard Research report. However, I am satisfied that the appraiser correctly distinguished the situation at bar from the facts of the case of Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121, in that Mr. duPont was not the majority stockholder of the merged corporation, nor was he seeking to acquire shares at a rigged price. I am satisfied that there was a bona fide market for shares of Delaware Steeplechase from March 1962 to the date of merger, notwithstanding the fact that many of the shares traded during that period were donated to the resulting charitable corporation at the market price. Furthermore, the price at which shares were traded in said market was higher than the prices at which the stock was traded over the years 1958 through 1960 inclusive, according to the records before me of the principal brokers for such stock. Consequently, the cases of Tri-Continental Corp. v. Battye, and Adams v. R. C. Williams, supra are distinguishable. Without accepting the appraiser's precise conclusions as to price and weighting, objectants' exception to his basic conclusions as to market will be over-ruled.
Turning to asset value, it appears that the appraiser accepted the appraisal of racing plant and equipment made by Appraisal Affiliates, a qualified concern which assigned two men to the job for a period of about a month. To the figure of $9,134,702 found by such firm to be the going concern value of the racing plant and equipment, the appraiser added replacement cost less depreciation of shrubs and other plants on the basis of an estimate submitted by Lawrence B. Palmer. This amount totaled $462,068. He also added the book figure of $211,898 for the racing strips, being the amount at which they were carried. However, because Appraisal Affiliates did not take into consideration elements of functional and economic obsolescence, the appraiser, adopting the age-life method of depreciation outlined in a treatise entitled[1] The Appraisal of Real Estate (1960), found that the racing facilities here inolved had an initial life expectancy of 331/3 years and that the age-life rate had been 3% a year. He selected 1% thereof as attributable to combined functional and economic obsolescence, a figure which he applied over the twenty-seven year life of the track. The result was the fixing by him of a going concern value of $7,160,328 for the entire racing plant and equipment.
Objectants take exception to the appraiser's alleged failure to take into account a prepaid architect's fee and so-called leasehold improvements. I find, however, that objectants did not pursue *669 the opportunity accorded them to show that such charges had not been included in a deferred charges item. Objection is also made to the appraiser's valuation of the hard used racing strips, however, I can not accept the estimate submitted by the witness Terres in view of the fact that major improvements therein were last made in 1947. Finally, I must overrule objectants' exception to what I agree to be the facts of economic obsolescence brought about in part by changes in means and methods of access to the track resulting from factors which were not adequately anticipated in 1937. For instance, the popular entrance to the track now used by many patrons is from the east, while the main parking area is on the west beyond the restricting tracks of the Baltimore and Ohio Railroad which now serve as a hindrance rather than a help to racing.
On the basis of the non-speculative expert testimony, the appraiser found that the approximately 680 acres at Stanton on which Delaware Park is located and a small farm owned by the resulting corporation at Frederica, Maryland, had a value of $2,734,000 on the date of merger. From this figure he subtracted the cost of razing the existing plant, namely $457,000, in order that the highest and best use of the land at Stanton might be realized. According to the evidence, such use would be residential development. These findings will not be disturbed despite objectants' contention that as a speculation, use of the land for industry would no doubt mean a greatly higher per acre valuation.
The appraiser having accepted the corporation's book earnings rather than the objectants' recomputed earnings, exception is principally taken by the latter to the sum-of-digits method used by the corporation with the approval of the taxing authorities. This method of depreciation permits rapid but unrealistic depreciation over the early years of a facility. However, I am of the opinion that the appraiser was basically right in accepting the corporation's own earnings figures and that he correctly refused to do what was done by the witness Terres, namely to recalculate depreciation on all of the track's assets from the date originally acquired on bases and rates which such expert considered more justifiable than those used by the corporation. The point is that even Mr. Terres conceded that the corporation accounts in question were kept in accordance with accepted practices and that the methods of depreciation used by management were acceptable except for a minor error in depreciating land. I therefore decline to accept objectants' contentions that corporate earnings over a five year period should be reconstructed so as to average out at $256 per share. Furthermore, for reasons alluded to earlier in this opinion, I am of the opinion that the five year period for averaging earnings should exclude 1958 and include 1963, the gross earnings for which had been substantially achieved as of the end of racing in that year. Such averaged earnings amount to $120.19 per annum for the period from 1959 to July 31, 1963. However, because Delaware Park can not be actually classified as a public utility in the light of its competitive position vis ā vis both thoroughbred and trotting racing in the area from which patrons must be attracted and also because the high multiplier used by Standard Research was based on factors other than average earnings, the multiplier used by the appraiser and the higher one urged by objectants are clearly unwarranted.
Exception is also taken to the zero value which the appraiser gave to dividend value. This was done because such a factor is obviously allied to earnings and the record establishes that the project here in issue contained no reasonable probability of earnings being passed on to stockholders in the form of dividends. Objectants argue that in such a situation dividends should be ignored and the independent weight which might otherwise be attributed to such factor should be included in the weighting of earnings. In my opinion, however, under the facts of record, the appraiser was correct *670 in giving negative recognition to such factor. In other words, the long and undisturbed history of no payment of dividends must be given recognition and not merely ignored. That is to say that while there is little doubt but that had there not been governmental obstacles to such course of action some dividends could well have been paid out during the life of the track, the point is none was.
Under Title 8 Del.C. § 262 "* * * the dissenting stockholder is entitled to receive the intrinsic value of his share in a going concern. This can mean only that he is entitled to receive that sum which represents the amount he would have received as a stockholder in one way or another as long as the company continued in business. * * *" Tri-Continental Corp. v. Battye, supra. When an investor buys stock he is considered to be buying into a going concern and not into a liquidation, and when a merger forces him out he should be paid for what he has been deprived of, Chicago Corporation v. Munds, 20 Del.Ch. 142, 172 A. 452. In determining what has been termed intrinsic value, market value, asset value, dividends, earning prospects, the nature of the enterprise involved and "* * * any other facts which were known or which could be ascertained as of the date of merger which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to value of the dissenting stockholders' interest, but must be considered by the agency fixing the value." Tri-Continental Corporation v. Battye, supra. Compare Levin v. Midland-Ross Corporation (Del.Ch.) 194 A.2d 50.
Fixing asset value of $5,996 per share, such value will be weighted at 25%. While the physical lay-out of Delaware Park as of the time of merger represented in substantial part the application of accumulated earnings to plant and equipment, these assets are not headed for liquidation and merely serve to provide the means for making further earnings. It would be unwarranted, in my opinion, to apply here the philosophy of In re General Realty & Utilities Corporation, 29 Del.Ch. 480, 52 A.2d 6, and Levin v. Midland-Ross, supra, in which substantial assets were in highly liquid form at the time of merger.
Market value will be fixed at $1,305 on the basis of the so-called reconstructed market value found by Standard as of the date of merger. It will be weighted at 40% because I am satisfied that a sale of stock was the most likely way that an investor in the merged corporation might have expected to realize on his investment.
For the reasons given earlier in this opinion, earnings will be fixed at $120.19 per annum for the period from 1959 to the date of merger, and these earnings will be multiplied by 10, the highest permissible multiplier, in my opinion, for the type of business here involved as of the date of merger. And this is done on the theory that although the business conducted by petitioner can not be insulated from out of state racing competition by governmental regulation, nonetheless it is the sole licensee of thoroughbred racing in Delaware. Furthermore, because earnings are peculiarly important when viewed against the background of no dividends and because some adjustment should be made, as the appraiser indicated, to compensate for the rapid depreciation employed by the merged corporation, they will be weighted at 25%. Finally, the substantial negative recognition accorded dividends by the appraiser as a corollary to earnings will also be accepted here.
In summary, my findings are as follows:

Asset Value $5,996.00 Ũ 25% $1,499.00
Market Value $1,305.00 Ũ 40% 522.00
Earnings Value $1,201.19 Ũ 25% 300.30
Dividend Value 0 Ũ 10% --
 _________
 $2,321.30
 =========

*671 The sum of $2,321.30 is found to be the intrinsic value of shares of stock of Delaware Steeplechase and Race Association as of the date of merger, and on notice an order in conformity with the above may be submitted.
NOTES
[1] By American Institute of Real Estate Appraisers.