808 F.2d 246
 KEEFFE, Carol Ann, Individually, & Keeffe, Carol Ann, as
Trustee for Melissa Ann Keeffe, Appellant,
v.
CITIZENS AND NORTHERN BANK, & C.T. Conover, Comptroller of
the Currency.
 No. 86-5333.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 17, 1986.
Decided Dec. 29, 1986.
 
 David B. Keeffe (argued), De Sisti & Keeffe, P.C., Sayre, Pa., for appellant.
 Raymond E. Ginn, Jr. (argued), Owlett & Lewis, P.C., Wellsboro, Pa., for appellee Citizens & Northern Bank.
 James J. West, U.S. Atty., Barbara L. Kosik, Asst. U.S. Atty., Scranton, Pa., Eugene M. Katz, Rosa M. Koppel (argued), Litigation Div., Comptroller of the Currency, Washington, D.C., for appellee Comptroller of the Currency.
 Before SEITZ, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 Carol Ann Keeffe appeals a final judgment of the district court in favor of defendants Citizens & Northern Bank (Citizens) and C.T. Conover, Comptroller of the Currency (Comptroller). The controversy arises from the Comptroller's appraisal of Keeffe's stock following the merger of Farmers National Bank (Farmers) and Citizens. We have jurisdiction under 28 U.S.C. Sec. 1291 (1982).
 
 
 2
 * On March 10, 1983, subject to stockholder approval, Farmers entered a merger agreement with Citizens. Under the terms of the agreement, Citizens would exchange 8 shares of its stock for each share of Farmers stock.
 
 
 3
 On March 15, 1983, the president of Commonwealth Bank & Trust Company (Commonwealth) wrote to the president of Farmers and expressed interest in a merger of the two banks.[1] The letter indicated Commonwealth would offer Farmers approximately 14 shares of its stock for each share of Farmers stock. Since Commonwealth had a fair market value of $16 per share, under this plan Farmers shareholders would receive $224 worth of Commonwealth stock for each share held.
 
 
 4
 On May 2, 1983, the Farmers board of directors mailed the Farmers stockholders notification that it had approved the March 10 merger agreement with Citizens along with a proxy statement requesting approval of the agreement. The Farmers directors indicated that the Citizens stock had a fair market value of $25 per share at this time. Accordingly, Farmers shareholders would receive $200 worth of Citizens stock for each share of Farmers.
 
 
 5
 On May 18, 1983, Commonwealth extended a formal merger proposal to Farmers, offering 18 shares of its stock for each share of Farmers. Based on the $16 per share value of Commonwealth, Farmers shareholders would receive Commonwealth stock worth $288 for each share of Farmers. As an alternative, Commonwealth offered the Farmers shareholders a ten-year capital note with a face value of $234 and a stated interest rate of 10% interest for each Farmers share.
 
 
 6
 Citizens responded by increasing its offer for Farmers to 9 1/2 of its shares for each share of Farmers. Based upon the $25 per share value of Citizens, each Farmers shareholder would receive Citizens stock worth $237.50 for each share held. As an alternative, Citizens offered Farmers shareholders a five-year capital note with a principal value of $237.50 and a stated interest rate of 10 1/2% in exchange for each Farmers share.
 
 
 7
 The Farmers directors then voted to accept Citizens' later offer. On September 19, 1983 the Farmers shareholders voted their approval of the Citizens offer, and the banks merged. Keeffe, who held over 900 shares of Farmers stock, voted against the proposal and perfected her dissenter's rights pursuant to 12 U.S.C. Sec. 214a (1982) by surrendering her stock and requesting fair value for her shares. After negotiations, Citizens notified Keeffe that it appraised her shares of Farmers at $213.59. Keeffe rejected the appraisal. Pursuant to Section 214a, Citizens then requested the Comptroller to appraise the shares.
 
 
 8
 Keeffe submitted to the Comptroller a brief in support of her position regarding the value of the Farmers stock. The brief contained an appraisal prepared by Whitesell, a financial expert, which appraised the Farmers stock at $326.54 per share.
 
 
 9
 The Comptroller considered the arguments and submissions of the parties and conducted his own research. He appraised the Farmers stock at $228.67 per share as of September 19, 1983.
 
 
 10
 The Comptroller's decision was accompanied by a memorandum outlining in detail the methodology, commonly known as the "Delaware Block Method," used in evaluating the stock. The Delaware Block Method is based on a weighting of the following four measures of a stock's value: fair market value, book value, adjusted book value, and investment value. The memorandum described the four measures and set forth the weight, if any, given each in the Comptroller's appraisal. He assigned no weight to fair market value or book value of the Farmers stock.
 
 
 11
 Keeffe subsequently filed this action in the district court contending that the appraisal was unreasonable, arbitrary and capricious. Jurisdiction was based, inter alia, on 28 U.S.C. Sec. 1331 (1982). The complaint also sought interest on the Farmers shares for the period between the surrender of the shares and the tender of the stock's value following the Comptroller's appraisal. Finally, the complaint alleged that Keeffe had been deprived of property without due process in violation of the Fifth Amendment. The district court granted summary judgment for Citizens and the Comptroller, holding that the appraisal was not arbitrary, unreasonable or capricious. The court's memorandum opinion did not mention Keeffe's request for interest or her constitutional claim. This appeal followed.
 
 II
 
 12
 Before turning to the merits, we must consider Citizens' contention that the Comptroller's appraisal under Section 214a is not reviewable in federal court.[2] Citizens relies on the language of Section 214a(b): "... the Comptroller shall upon written request of any interested party, cause an appraisal to be made, which shall be final and binding on all parties."
 
 
 13
 The Administrative Procedure Act (APA) confers a general cause of action upon persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. Sec. 702 (Supp.III 1985), except to the extent a relevant statute precludes judicial review, 5 U.S.C. Sec. 701(a)(1) (1982). The Supreme Court has stated that "the question whether a statute precludes judicial review 'is determined not only from its express language, but also from the structure of the statutory scheme, its objective, its legislative history, and the nature of the administrative action involved.' " Lindahl v. Office of Personnel Management, 470 U.S. 768, 779, 105 S.Ct. 1620, 1627, 84 L.Ed.2d 674 (1985), quoting Block v. Community Nutrition Institute, 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984); Wheaton Industries v. United States Environmental Protection Agency, 781 F.2d 354, 356-57 (3rd Cir.1986). There remains a presumption in favor of judicial review of administrative action. Block, 467 U.S. at 349.
 
 
 14
 There is scant case law considering the reviewability of the Comptroller's appraisals of dissenters' stock in the bank merger context. In Beerly v. Dep't of Treasury, 768 F.2d 942, 944-45 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1184, 89 L.Ed.2d 301 (1986), the seventh circuit determined that a Comptroller's appraisal under 12 U.S.C. Sec. 215a (1982) is reviewable in federal court. Section 215a is a sister provision of Section 214a, dealing with slightly different bank mergers, and it contains the same "final and binding" language as Section 214a. See 12 U.S.C. Sec. 215a(c) & (d) (1982). The court based its determination in part on a presumption of judicial review, citing Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It also relied on the notion that appraisal of dissenters' shares is traditionally a judicial function, one which invites judicial review when performed by an administrative agency rather than a court.
 
 
 15
 The only other reported decision considering the reviewability of Comptroller appraisals in this context is Simonds v. Guaranty Bank and Trust Co., 492 F.Supp. 1079 (D.Mass.1979). The Simonds court determined that the Comptroller's appraisals under Section 214a were reviewable. The court relied upon: (i) the Abbott Laboratories presumption of reviewability; (ii) the fact that courts have traditionally considered valuation questions in the context of appraisal of dissenting shareholders' stock; (iii) a desire to protect the shareholder from arbitrary agency action; and (iv) the notion that review would not reduce the Comptroller's effectiveness in making appraisals. Simonds, 492 F.Supp. at 1081-82.
 
 
 16
 The strongest argument against reviewability of appraisals under Section 214a is the statutory language quoted above. This language, however, does not explicitly forbid review. There is a palpable difference between the "final and binding" language of Section 214a(b) and the language of statutes cited by the Supreme Court in Lindahl as examples of statutes in which Congress intended to preclude review. See Lindahl, 470 U.S. at 779-80, 105 S.Ct. at 1627-28, citing 5 U.S.C. Sec. 8128(b) (1982) (compensation for work injuries) ("The action of the Secretary [of Labor] or his designee in allowing or denying a payment under this subchapter is--(1) final and conclusive for all purposes and with respect to all questions of law and fact; and (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.").
 
 
 17
 The remaining factors relied on by the Block court, moreover, indicate that Congress did not intend to preclude judicial review of Comptroller appraisals under Section 214a. The legislative history gives no indication that Congress intended to preclude judicial review. No objective of the statutory scheme would be frustrated, nor any part of the statutory structure impaired, by judicial review of the Comptroller's appraisals. In addition, as both Beerly and Simonds note, appraisal of dissenting shareholders' stock is a task which is traditionally performed by courts. Review of an appraisal is therefore a task for which courts are well suited.
 
 
 18
 In light of the foregoing analysis, we conclude that the Comptroller's appraisals under Section 214a are reviewable under the APA.
 
 III
 
 19
 Keeffe raises a bevy of arguments in support of her contention that the Comptroller's appraisal was improper. The district court reviewed the Comptroller's appraisal to ensure that the valuation was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with applicable law. 5 U.S.C. Sec. 706(2)(A) (1982); Beerly, 768 F.2d at 945; Simonds, 492 F.Supp. at 1081. Our review of the district court's determination is plenary.
 
 
 20
 Keeffe contends that the Comptroller's use of the Delaware Block Method to appraise the stock is arbitrary and capricious. She argues that there are more reliable methods of valuing stock and notes that a recent decision of the Delaware Supreme Court indicates that it no longer considers the Delaware Block Method the sole reliable method of valuing dissenters' stock. Weinberger v. UOP, Inc., 457 A.2d 701, 712-13 (Del.1983). We, however, agree with Judge Posner's conclusion in Beerly:
 
 
 21
 Although [the Delaware Block] method has frequently been criticized ..., the fact that the Comptroller was following a conventional approach goes far to shield his results from judicial invalidation. It is not for a reviewing court to tell an administrative agency to defy the conventional wisdom, to innovate, to be daring.
 
 
 22
 Beerly, 768 F.2d at 945-46.
 
 
 23
 Keeffe also contends that the Comptroller abused his discretion by refusing to follow Whitesell's appraisal. The record demonstrates that the Comptroller considered the Whitesell appraisal. He was, however, under no obligation to adopt Whitesell's appraisal as his own. Accordingly, the Comptroller's refusal to adopt Whitesell's appraisal, without more, was not an abuse of discretion.
 
 
 24
 Keeffe next contends that the Comptroller's appraisal method violates the intent and objectives of Section 214a because the Comptroller's appraisal method produced a value not only lower than the alleged fair market value, but also lower than the merger price. While we agree with Keeffe's premise that Section 214a is designed to give dissenting shareholders the fair value of their stock, the fact that application of the Delaware Block Method led to a value unacceptably low in Keeffe's eyes does not mean the method is arbitrary and capricious.
 
 
 25
 Keeffe finally contends that the Comptroller abused his discretion in his application of the Delaware Block Method. Keeffe admits that there was no active market for Farmers shares prior to the Citizens and Commonwealth offers to merge with Farmers. She nevertheless argues that the Commonwealth and Citizens merger proposals demonstrate the existence of a market for Farmers shares at the time of the merger and that the Commonwealth and Citizens offers can be used to establish market value. Therefore, Keeffe contends, the Comptroller's failure to assign any weight to market value when appraising the Farmers stock was arbitrary and capricious.
 
 
 26
 We agree with Keeffe's contention that there was a market for Farmers shares at the time of the merger. The academic literature is replete with discussions of the merger activity in the banking industry in recent years, see, e.g., Staff, Davidson, & McDonald, Increased Bank Merger Activity: Causes and Effects, 24 Amer.Bus.L.J. 67 (1985), and the competing offers of Citizens and Commonwealth demonstrate Farmers was an active participant in the merger market. We do not agree, however, that the Citizens and Commonwealth offers can be used in this case to establish market value of the Farmers stock, as market value is traditionally employed in the Delaware Block Method.
 
 
 27
 The Delaware Supreme Court has indicated that market value, as that term is used in the Delaware Block Method, means the value of shares traded in an established market. Application of Delaware Racing Assoc., 42 Del.Ch. 406, 213 A.2d 203, 210 (1965). The Delaware courts have also made clear that market value should not be taken into account when the stock in question is too thinly traded, Adams v. R.C. Williams & Co., 39 Del.Ch. 61, 67-71, 158 A.2d 797, 801-02 (1960), or where the market for the stock is not dependable, Sporborg v. City Specialty Stores, 35 Del.Ch. 560, 564-66, 123 A.2d 121, 124 (1956). In addition, Delaware courts have indicated that the market value included in an appraisal of a dissenter's stock should be uninfluenced by the transaction from which the shareholder dissents. Tri-Continental Corp. v. Battye, 31 Del.Ch. 523, 74 A.2d 71, 74 (1950); In re Olivetti Underwood Corporation, 246 A.2d 800, 804-05 (Del.Ch.1968).
 
 
 28
 In the present case Citizens and Commonwealth were competing to acquire Farmers. We think it reasonable to infer that their offers might contain premiums reflecting the desires of the competing banks to obtain Farmers for their own special reasons over what individual purchasers of Farmers' stock might pay in an established market. Such reasons might include the acquisition of deposits or entrance into new markets. Because the offers contain such premiums, the offers are not accurate reflections of the traditional market value of the stock, defined in terms of shares traded individually in an established market. Because the Commonwealth and Citizens offers do not establish such a market value the Comptroller did not abuse his discretion by assigning no weight to market value in appraising Keeffe's shares.[3]
 
 IV
 
 29
 Finally, we turn to Keeffe's assertion that Section 214a's requirement of stock surrender and the absence of a provision requiring the payment of interest on the value of the surrendered shares combine to deprive her of property without due process in violation of the Fifth Amendment to the United States Constitution.[4]
 
 
 30
 Originally enacted in 1950, Section 214a is an addition to the Bank Conservation Act of 1933. As such, it is legislation "adjusting the burdens and benefits of economic life." Hodel v. Indiana, 452 U.S. 314, 323, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981), quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). When Congressional enactments under the Commerce Clause adjust the burdens and benefits of economic life, due process challenges to their constitutionality are measured under the rational basis test. Hodel, 452 U.S. at 323-24, 101 S.Ct. at 2382-83. While Congressional authority for banking legislation rests on different constitutional grounds, see Farmers' & Mechanics' Nat. Bank v. Dearing, 91 U.S. (1 Otto) 29, 33, 23 L.Ed. 196 (1875) and McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 400-24, 4 L.Ed. 579 (1819), we believe that its character as legislation adjusting the benefits and burdens of economic life requires us to consider due process challenges to federal banking statutes under the rational basis test.
 
 
 31
 This view has been adopted in at least one circuit. In Northside Iron & Metal Co., Inc. v. Dobson & Johnson, Inc., 480 F.2d 798 (5th Cir.1973), the fifth circuit considered a challenge to the constitutionality of the statute governing the appropriate venue for suits against national banks, 12 U.S.C. Sec. 94 (1982). The court found the statute had a rational basis and rejected the appellant's contention the statute violated due process. Id. at 800. Cf. Smith v. Witherow, 102 F.2d 638, 642 (3rd Cir.1939) (rejecting a challenge to the constitutionality of the Bank Conservation Act's provision authorizing the appointment of a conservator, see 12 U.S.C. Sec. 203 (1982), on the ground that the statute was "reasonable and appropriate").
 
 
 32
 Under the rational basis test, Section 214a comes to this court with a presumption of constitutionality. Hodel, 452 U.S. at 323, 101 S.Ct. at 2382-83. This court may invalidate Section 214a only if it is clear that there is no rational basis for the Congressional judgment or if there is no reasonable connection between the means selected and the asserted ends. Id. at 323-24, 101 S.Ct. at 2382-83.
 
 
 33
 We cannot conclude that Section 214a lacks a rational basis. One of the asserted goals of Section 214a is to "protect dissenting shareholders of national banks ... by permitting them to receive the value of their stock in cash." S.Rep. No. 1104, 81st Cong., 2nd Sess. reprinted in 1950 U.S.Code Cong. Service 3012, 3013. We believe the statute reasonably achieves this goal. It is not for this court to decide the value of the surrender requirement and whether Congress ought to provide for the payment of interest to dissenting shareholders during the appraisal period. "If the ... statute is to be amended ..., Congress is the body which must act to do so...." Northside Iron, 480 F.2d at 800.
 
 
 34
 For the foregoing reasons, Keeffe's constitutional challenge must be rejected.
 
 V
 
 35
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Keeffe contends the March 15 letter constituted a formal merger offer. In our view of the case, it does not matter whether the letter constituted such an offer
 
 
 [2]
 The Comptroller does not join Citizens' argument
 
 
 [3]
 Because the question is not before us, we need not consider whether, if the Comptroller were to employ a different method of appraising dissenters' stock, it would be permissible for the Comptroller to consider the offers of potential acquirors as evidence of the stock's value
 
 
 [4]
 Keeffe no longer presses her claim that Section 214a entitles her to interest on the value of the Farmers shares for the period between surrender of the shares and tender of the stock's value following the Comptroller's appraisal