123 A.2d 121 (1956)
William D. SPORBORG, Jr., Elizabeth S. Morse, Sidney N. Morse, Jr., Sidney N. Morse, Morton M. Adler, Helen Adler, Nathan Kelmenson, Austin Tobey, and Benjamin M. Gruenstein, Plaintiffs,
v.
CITY SPECIALTY STORES, Inc., a Delaware Corporation, Defendant.
Daniel P. SHEPARD and Mary L. D. Shepard, Plaintiffs,
v.
CITY SPECIALTY STORES, Inc., a Delaware Corporation, Defendant.
Court of Chancery of Delaware, New Castle.
June 8, 1956.
*123 Frank O'Donnell (of Berl, Potter & Anderson), Wilmington and William D. Sporborg, Jr., Port Chester, N. Y., for plaintiffs, except Daniel P. Shepard and Mary L. D. Shepard.
George T. Coulson (of Morris, Steel, Nichols & Arsht), Wilmington, for defendant.
SEITZ, Chancellor.
As a consequence of a merger of Oppenheim Collins & Co., Inc. ("Opcol") and Franklin Simon & Co. into City Specialty Stores, Inc., certain owners of stock of Opcol dissented and requested an appraisal of their shares. The appraiser fixed the value at $30.61 per share as of January 30, 1953, the effective date of the merger. Both the corporation and the dissenting shareholders have filed exceptions to the report of the appraiser and this is the decision thereon.
Preliminarily, it is well established that in an appraisal proceeding under our statute the shares must be valued on a going concern basis. Tri-Continental Corp. v. Battye, 31 Del.Ch. 523, 74 A.2d 71.
Opcol was an old well established specialty sales business, dealing primarily in ladies' apparel and accessories. At the merger date it had about 15 retail stores located in several large and medium sized cities.
The following chart shows the results of the appraiser's findings:

 Values of Shares Wgt. Given Value attributable
Value Elements Based on Element Element to Element
-------------- ---------------- -------- ------------------
Assets 42.35 40% 16.94
Earnings 18.50 25% 4.625
Sales 25.27 25% 6.318
Market Value 27.25 10% 2.725
 _______
 Value of Share 30.608
 -------

*124 I believe all exceptions can be determined under the headings which follow.

1. Did the Appraiser Err in Giving Market Value Independent Weight?

I agree with the appraiser that market value is one of the elements to be considered in this type of proceeding. However, after considering it, I do not think it should have been given any independent weight here because the evidence shows that there was no dependable market value at or about the effective date of the merger. Compare Tri-Continental Corp. v. Battye, above. Prior to January 31, 1950, City Stores or Bankers Security controlled 50.84% of Opcol stock. Thereafter additional purchases were made by them so that by January 30, 1953, they controlled 96.21%. For at least two years prior to the merger, City Stores (or Bankers Security, which is treated the same) maintained the market in Opcol with a bid of $27.25 per share, and virtually every transaction during that period was effected for their account. In the last calendar year, 1800 of the 1900 shares traded were purchased by them. Thus the purchases were made almost entirely at a fixed price and at a time when that Corporation was already its majority stockholder. The expert testimony also sustains the artificiality of the $27.25 market value attributed to the stock. Compare Sterling v. Mayflower Hotel Corp., Del.Ch., 93 A.2d 107, 38 A.L.R.2d 425.
The appraiser held that the situation here differs from the Mayflower case, saying:
"* * * for here the inference that the majority knew that the price it was paying was a fair price or better, is at least of equal validity to the inference that it was paying a greater price than would be justified in a more normal market. In the Mayflower Hotel case, the majority interests had just purchased a large single block of stock and wanted to avoid a charge that they gave `special treatment' to one group."
The difficulty with this alleged distinction is that it ignores the fact of the absence of a market other than that made by one party in interest. The more reasonable inference is that the stockholder holding most of the stock desired to acquire 100% control and thereby remove the problems incident to minority stock ownership. I take judicial notice of the fact that such acquisitions are frequently made at premium prices. To the extent the offering price should be considered, I believe it is fairly reflected in the value elements hereinafter found.
I therefore conclude that the exception to the appraiser's use of market value should be sustained.

2. Did the Appraiser Err in His Computation of Earnings Value?

In arriving at the earnings value to be capitalized the appraiser considered only the fiscal year immediately preceding the effective date of the merger ($1.85). He compared such earnings with comparable stores and apparently concluded that the last year's earnings of Opcol were a reliable figure upon which to capitalize earnings. The appraiser thus appears to have rejected the principle that, rather than immediate prospective income, the average income to be expected over a reasonable period of time is the rule to be followed in making an appraisal. This principal is pointed out in In re General Realty & Utilities Corp., 29 Del.Ch. 480, 52 A.2d 6, 12:
"The stock market valuations are influenced appreciably by prospects for immediate increase and decrease in income; but the long-range prospects furnish the basis for sound valuation."
In Vol. 1 Bonbright, Valuation of Property, p. 253, the author states:
"There is still an agreement among writers that a capitalization of average earnings over a period of 3 to 5 *125 years (occasionally 10 to 15 years) is preferable, in most cases, to a capitalization of the earnings of any single year."
True, the upward trend of this Corporation in the last fiscal year may suggest the likelihood that future earnings may be even greater than those of preceding years. But this does not justify the use of only a single year's earnings. I doubt that the stockholders would have urged the 1952 figures as the sole basis for future earnings' estimates if, instead of being a peak year, it had been an unusually poor one.
Defendant's exception on this point is sustained but as hereafter appears, the final earnings value price employed will be that suggested by defendant.
The defendant Corporation contends that the capitalization rate should have been five and not ten as used by the appraiser.
The task of finding a realistic capitalization rate is fraught with difficulties. Moreover, it can be misleading if the figures are used apart from the facts surrounding the particular corporation involved. Compare Cottrell v. Pawcatuck Co., Del.Ch., 116 A.2d 787; 1 Dewing, Financial Policy of Corporations, 5th Ed., p. 287 et seq.; 1 Bonbright, Valuation of Property, p. 262 et seq.
Mr. Dewing in his work on Financial Policy of Corporations describes the various rates and I believe that Opcol would come under the class discussed in the following quotation from Vol. 1, p. 390:
"Businesses, well established, but involving possible loss in consequence of shifts of general economic conditions. They are strong, well established businesses, but they produce a type of commodity which makes them vulnerable to depressions. They require considerable managerial ability, but little special knowledge on the part of the executives  15%, a value approximately seven times the net earnings."
The capitalization rate of ten used by the appraiser is nearly the top value assigned to an individual business and very few are on this level. It embraces old established businesses with a minimum of risk. Certainly Opcol did not fit this classification. Rather, I believe Opcol optimistically falls within the six to eight capitalization range. The defendant Corporation concedes (brief p. 58) that the earnings value should be $13.00 on the basis of a price earnings comparison which takes into consideration the trend in 1952 and also the five year average.
Since this conceded figure is greater than that reached by capitalizing the average of five years' earnings based even on a multiplier of eight, I will adopt defendant's earnings figure of $13.00 per share.

3. Did the Appraiser Err in Considering "Sales Value" or "Investment Value" as an Independent Element of Value?

Apparently all parties agreed that "Sales Value" or "Investment Value" was a "new" factor insofar as appraisal proceedings are concerned. The element involves the hypothesis that all earnings of a mercantile venture must come from its sales, and management "can" convert an ascertainable portion of the sales into earnings, in this case 25%. Defendant describes it as a constructed market value based upon sales volume. Although, I agree with the appraiser's hypothesis, I do not believe sales value need be used as an independent element of value. It is in effect but another and even more theoretical method of determining earnings value. It thus duplicates that element in these proceedings without purpose.
I have seen no authority for its use as an independent element of value in an appraisal proceeding. New York cases[1] talk of "investment value" but they say:
"* * * investment value * * * takes account of such factors *126 as the capitalization of the company, earnings and dividend record, position in the industry, prospects of the business and the industry, and the over-all value of its securities in relation to general market conditions and the market values of comparable securities."
This is not the type of "investment value" which plaintiffs and the appraiser had in mind. They relied upon a percentage of sales volume. While this may be a practical valuation process for some purposes, for the reasons stated I do not believe it should be employed here.
The exception to the appraiser's use of "sales value" will be sustained.

4. Did the Appraiser Err in Finding an Asset Value of $4,225,000 for the Real Estate Owned by Opcol?

Opcol through wholly owned subsidiaries owned stores in Buffalo, Brooklyn and Philadelphia. The appraiser held that capitalization of net rental value was the best guide to the value of the real estate of the type here involved, basing his opinion on the evidence presented by the real estate experts. He then capitalized such income at the rate of six per cent to arrive at the asset value of such property.
The appraiser, in selecting his approach, must realize that the type of property under investigation is second in importance only to the purpose for which the appraisal is being made. The approach taken by the appraiser here seems to be well recognized and was a proper method when we keep in mind that the assets must be judged on a "going concern" basis.
In the Appraisal of Real Estate, 2d Ed., American Institute of Real Estate Appraisers 1951, at page 76, it is said:
"To estimate investment value in the appraisal of income-producing properties, the income approach will be the dominant approach. But only in rare cases will the estimate of value be based solely on a single approach."
Since the Corporation must be considered as a "going concern" in valuing the stock, rather than as a corporation in liquidation, I see no error committed by the appraiser in using the income capitalization approach here. Nor did the appraiser err when he used the rentals called for in the lease between Opcol and its wholly owned subsidiary. The mere fact that the leases were between a parent and wholly owned subsidiary, does not indicate that the rentals called for were not the fair rental values, particularly when he took into account the testimony of the real estate experts and compared his figures with the rentals of other like stores. Other evidence in the record lends additional support to his conclusion.
The stockholders say the appraiser erred in not considering other methods of arriving at the asset value of such assets. I have reviewed the evidence and find it unnecessary to rule on this point because the resultant difference is not sufficiently great to say that the figures employed by the appraiser are beyond the range of reason when compared with such value based on other valuation methods.
Should the fair value of such assets have been determined by capitalizing the net income at the rate of 5½ per cent, as called for by the stockholders, or seven as asked by the corporation? The appraiser used the rate of six per cent. As the court pointed out in Jacques Coe & Co. v. Minneapolis-Moline Co., 31 Del.Ch. 368, 369, 75 A.2d 244, and Heller v. Munsingwear, Del.Ch., 98 A.2d 774 (cases dealing with capitalization rate of earnings), if the multiplier employed by the appraiser is within the range of reason, the court will adopt it as its own. The reason for this rule is implicit in the imponderables of the valuation process. A review of the evidence shows that the capitalization rate of six per cent is well within the range of reason and therefore the court concludes that its use was proper.
Plaintiffs urge that the list of charge accounts represents an asset to be *127 valued independently. Other stores, in the same line as Opcol have like lists of charge account customers. Certainly the value of such property is here reflected in the earnings element of value. Moreover, plaintiffs agreed that good will should be omitted as a factor here. I cannot see that the list of charge accounts should be separately valued here.
The exceptions to the appraiser's determination of asset value as $42.35 are overruled.

5. Did the Appraiser Err in the Weight He Accorded the Elements of Value?

Since the appraiser gave independent weight to "market" and "sales" values and since I have ruled that such should not have been done, it will serve little purpose to discuss the various weightings employed by the appraiser.
We have here only two elements of value which in my opinion are entitled to independent weight  asset value ($42.35) and earnings value ($13).
Normally much greater weight is accorded the earnings value element for obvious reasons. However, I believe the asset value element must be given somewhat greater weight here because, for some time, Opcol was using more than an average amount of its assets to expand and improve its business activities and much of this was not yet reflected in earnings. Also the degree of the disparity between conceded asset value and earnings value is some further tentative proof that the earnings figure is low. My conclusion is supported in part by a comparison with similar businesses.
I therefore conclude that because of the special circumstances here present the asset value should be weighted at 40% and earnings at 60%. This results in a per share appraised value of $24.74.

6. Interest and Costs

The plaintiffs also except to the appraiser's failure to make an allowance of interest at 6% compounded annually since January 30, 1953.
Costs and interest are provided by statute, 8 Del.C. § 262(h):
"The cost of any such appraisal, including a reasonable fee to and the reasonable expenses of the appraiser, but exclusive of fees of counsel or of experts retained by any party, may on application of any party in interest be determined by the Court and taxed upon the parties to such appraisal or any of them as appears to be equitable, * * *. The Court may, on application of any party in interest, determine the amount of interest, if any, to be paid upon the value of the stock of the stockholders entitled thereto."
Preliminarily, I think under the statute the question of interest is probably a matter for the Court and not the appraiser. So viewing the matter, I believe simple interest should be allowed here for the full period from the effective date of the merger to the date of payment. I decline to engage in a prolonged analysis of the record to attempt to fix blame for the fact that the matter was clearly drawn out too long. The fact is that the defendant Corporation had the use of plaintiffs' money during this period without any ownership obligation toward plaintiffs.
The parties disagree on the rate of interest to be allowed. No evidence was presented to me as to the going rate of money during the period involved. This obligation, as I read the statute, rested with the stockholders. I do not believe the statute necessarily calls for the legal rate. Otherwise, there would have been no purpose to the use of language which appears to leave the matter open. If the parties cannot agree on the rate or do not desire to have a further hearing thereon, it will be fixed at 4% based on the going money rate fixed in a recent case. Compare Speed v. Transamerica Corp., D.C., 135 F.Supp. 176. I do not suggest this is the only approach to a determination of the proper rate of interest.
*128 Costs are generally assessed against the resulting corporation in this type of proceeding. However, this rule is altered if bad faith or other such factors appear. See Meade v. Pacific Gamble Robinson Co., 30 Del.Ch. 509, 58 A.2d 415; Tri-Continental Corp. v. Battye, above. The defendant Corporation charges plaintiffs were guilty of bad faith, occasioned unnecessary expense and made use of the proceeding for the purpose of being bought off. Most of this charge stems from what defendant believes was an unconscionable use of discovery proceedings before the appraiser. However, in substance, the appraiser found no abuse and while the proceedings "got out of hand" I am not prepared to say that the record supports a finding of bad faith, etc.
The costs will therefore be assessed against the defendant Corporation.
Order on notice.
NOTES
[1] Application of Behrens, Sup., 61 N.Y.S.2d 179, 183.