### In re OLIVETTI UNDERWOOD CORPORATION, a Delaware corporation, an appraisal proceeding.

Court of Chancery of Delaware.

New Castle.

Sept. 27, 1968.

---

Arthur J. Sullivan, of Morris, James, Hitchens & Williams, Wilmington, for petitioning stockholders.

Bruce M. Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington, and Peter D. Ehrenhaft, Washington, D. C., for Olivetti Underwood Corp.

DUFFY, Chancellor:

The case is before the Court on an Appraiser's report of the value of shares of common stock after merger and exceptions thereto filed by both the stockholders and the corporation.

On October 23, 1963 Underwood Corporation, a Delaware corporation ("Under-

wood"), was merged upstream into Olivetti Underwood Corporation, a Delaware corporation ("Olivetti Underwood"), under 8 Del.C. § 253.[1] At the time Olivetti Underwood was entirely owned by Ing. C. Olivetti & C., S.p.A., an Italian corporation ("Olivetti Italy"), and Olivetti Underwood was a more than 90% parent of Underwood.

Upon the merger Olivetti Underwood offered $10 cash for each publicly-held share of Underwood. Appraisal is sought in this proceeding for about 16.035 shares.

## I

Underwood was an old line producer of typewriters, "figuring" machines and related equipment and its stock was traded on the New York Stock Exchange. During the early 1950's Underwood's earnings ranged from a high of $5,500,000 to a low of $1,150,000. Beginning in 1956 and continuing without interruption thereafter the company lost money, including $7,110,000 in 1958. Underwood attempted in various ways to turn its financial operation around, but by mid-1959 it was plain that all such efforts were unsuccessful.

Olivetti Italy was an Italian producer of office equipment and one of the dominant companies in the European market. In September 1959 it acquired a one-third interest in Underwood by the purchase of 405,000 shares of previously unissued stock at a price of $21.50 per share. By the end of 1959 Olivetti Italy had assumed board and management control of Underwood. In the following year Underwood acquired from a wholly-owned American subsidiary, Olivetti Corporation of America ("Olivetti America"), its inventory, other physical assets, and a long-term agreement for the exclusive distribution rights of Olivetti products in the United States and Canada. Underwood issued 1,200,000 shares of its stock to pay for the purchase and, as a result thereof, Olivetti Italy became the owner of 69% of Underwood's shares.

Olivetti Italy made efforts to improve Underwood's condition by lending it money and by providing technical assistance. But by the year 1963 continuing losses resulted in complete extinguishment of Underwood's book net worth, and the New York Stock Exchange threatened de-listing of its stock because the company failed to meet the profitability and equity requirements of the Exchange.

On May 21, 1963 Olivetti Italy circularized to public stockholders of Underwood notice of an offer to purchase all publicly-held shares, numbering about 836,000. The notice advised stockholders of the threatened de-listing and stated:

"Regardless of the number of shares of Underwood acquired by Olivetti pursuant to this offer, Olivetti presently intends, through a new and wholly-owned subsidiary, to acquire the business and assets of Underwood. Olivetti has advised us that it is in a position to accomplish this either through voting its existing holding of more than two-thirds of the Underwood stock for a sale of Underwood's assets or, if it acquires more than 90% of the Underwood stock, to exercise alternative statutory rights to acquire Underwood."

Olivetti's notice offered $14.50 per share for the stock. From the beginning of 1963 until May the price of Underwood stock had ranged between $21 and $13; during May it ran from a high of 15⅜ to 13⅜ at closing on the day preceding the tender offer. On June 6 the Board of

1. The statute, prior to the comprehensive revision effective July 3, 1967, read, in part, as follows:
   "Any corporation organized * * * under the laws of this State * * * owning at least 90 per centum of the outstanding shares of each class of the stock of any other corporation * * * existing under the laws of this State, * * * [may] merge such other corporation * * * into it * * *, or * * * merge itself * * * into * * * such other corporations."

Governors of the Exchange resolved to suspend trading of Underwood on June 17. It was de-listed as of July 2.

As a result of its offer Olivetti Italy acquired more than 600,000 of the publicly-held shares and thus became a 90% parent and in a position to compel liquidation of the remaining public shares in a short-form merger under the then prevailing statute, 8 Del.C. § 253; Stauffer v. Standard Brands Incorporated, 41 Del.Ch. 7, 187 A.2d 78 (1962).

During the period between June and October 23, 1963 Underwood's operations continued at a loss. About 230,000 shares were in the hands of some 2,000 public stockholders and approximately 50,000 shares were transferred during that time. The stock was sold over the counter at prices ranging from $14.50 to $7.00. The bid price on the merger date was $9.50.

## II

■ For appraisal purposes the stock is to be valued on a going-concern and not a liquidation basis; the true or intrinsic value of the stock is to be determined by considering all factors and elements which reasonably may enter into this; these include market value, asset value, dividends, earning prospects and the nature of the enterprise. Tri-Continental Corporation v. Battye, 31 Del.Ch. 523, 74 A.2d 71 (1949); compare Poole v. N. V. Deli Maatschappij, Del., 243 A.2d 67 (1968).

The contentions of the parties and their differences with each other and with the Appraiser are illustrated by the following tabulations:

The stockholders submit the following basis for valuation:

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $16.00 | 25% | $ 4.00 |
| Market | 14.50 | 50 | 7.25 |
| Assets | 20.53 | 25 | 5.14 |
| | | Value per share | $16.39 |

Olivetti Underwood submits the following:

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $ 0 | 30% | $ 0 |
| Dividends | 0 | 10 | 0 |
| Market | 9.50 | 30 | 2.85 |
| Assets | 0 | 30 | 0 |
| | | Value per share | $ 2.85 |

The Appraiser fixed the valuation by using the following factors:

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $ 0 | 20% | $ 0 |
| Market | 14.25 | 60 | 8.55 |
| Assets | 16.38 | 20 | 3.28 |
| | | Value per share | $11.83 |

### A. Earnings

I first consider the value factor with respect to earnings. During the years between 1956 and 1963, inclusive, Underwood annually and regularly sustained losses (after eliminating extraordinary charges) that

varied between $14.30 and 80¢ per share. In the light of this factor, the Appraiser assigned a value of zero to earnings.

Arguing that the years between 1959 (when Olivetti Italy took control) and 1963 were "abnormal," the stockholders contend that the Appraiser should have used the period between 1950 and 1958 when Underwood had average earnings of $2.00 per share.

■■ It is established law in Delaware that income averaged over a reasonable period is to be considered in determining earnings for appraisal purposes. Sporberg v. Cities Specialty Stores, 35 Del.Ch. 560, 123 A.2d 121 (Ch.1956). And average earnings over the five-year period immediately preceding the merger is ordinarily used as the basis for determining earnings value. Application of Delaware Racing Association, 42 Del.Ch. 406, 213 A.2d 203 (1965).

■ The stockholders do not provide any reasonable basis for departing from the ordinary rule and going back thirteen years to a period beginning in 1950. Selection of that year would be wholly arbitrary. It is true that Underwood had a profitable operation for a time beginning then, but that alone is not a sufficient reason for going so far backward. And indeed the record here shows that the years 1958 through 1963 were probably more typical of Underwood's condition than were the years in which money was made. In any event, the stockholders have failed to advance persuasive reasons for going outside the ordinary period.

■ The stockholders also contend that an increase in sales occurred during the period 1957 to 1963 and that this is a significant factor which should be considered. But sales, whether gross or net, are but one index to be considered in examining earnings and future prospects; and the stockholders have failed to suggest how sales would be related to the other ordinary profit and loss items in order to arrive at a reasonable earnings factor. I do not mean to suggest that sales are irrelevant; I say only, as the Appraiser did, that no "mechanic" is suggested for their application.

■ Finally, the corporation contends that the dividend record should be considered as a separate value factor. Dividends were paid on Underwood stock up until 1957. During the years between 1958 and 1963 the corporation had no earnings and did not pay a dividend. In light of that, I am not persuaded that the absence of dividends or the failure of the company to pay them during this period should be given independent consideration by the Court. I agree with the Appraiser, who noted the absence of dividends while weighing the value factors.

The Appraiser's conclusion of earnings as a value factor will be approved.

### B. Market Value

I turn now to the factor of market value. The stockholders argue for a value of $14.50 per share, the company says it should be $9.50, and the Appraiser fixed it at $14.25 per share.

The stock was traded at the following prices during 1963:

| | Low | High |
|---|---|---|
| January | 17¼ | 21⅝ |
| February | 16¼ | 18¼ |
| March | 15½ | 17 |
| April | 13 | 16⅞ |
| May | 13⅜ | 15⅜ |
| June | 14⅛ | 14¾ |

On the day preceding the tender offer the stock closed at 13⅜.

In arriving at $14.25 per share the Appraiser concluded that market value was influenced strongly thereafter by the Olivetti Italy offer of May 21. And he apparently regarded the difference between the $14.50 offering price and the $14.25 price which he fixed as the premi-

um that Olivetti Italy was willing to pay for acquisitions.

■ The stockholders argue that $14.50 per share was the price that Olivetti Italy was willing to pay and did pay and therefore it should be fixed as the market price. This Court has judicially noticed that acquisitions are frequently made at premium prices. Sporberg v. Cities Specialty Stores, supra. And the Appraiser's finding as to a premium here seems reasonable under the circumstances, particularly in light of the market prices immediately preceding the tender offer.

Pointing to Olivetti Italy's 67% ownership prior to tender, the corporation argues that the freedom of the market to establish a fair price was no different after the tender offer than it was before. And it says that the Appraiser ignored the undisputed testimony of its expert, the New York Stock Exchange specialist in Underwood shares, who testified that there was a free and open market in the stock until and including October 23, 1963 and on that date the stock had a market value of $9.50 per share.

■ First, it is undisputed that Olivetti Italy's offer on May 21 was to buy all of the publicly-held shares at $14.50 per share and its plainly announced purpose was to acquire all of the stock. In light of that, it is unrealistic to say that the announcement did not have an impact upon the market price. Compare Sporberg v. Cities Specialty Stores, supra; Swanton v. State Guarantee Corporation, 42 Del.Ch. 477, 215 A.2d 242 (1965); and Levin v. Midland-Ross Corporation, 41 Del.Ch. 276, 194 A.2d 50 (Ch.1963). Hence, I am of the view that the Appraiser, in fixing market value, correctly considered only the time prior to the date of the tender offer. This is not to say that there was not a "free market" for all purposes after May 21. It is, however, to say that for appraisal purposes market value was so affected by the known position of Olivetti Italy that it does not provide a reliable guide for valuation purposes. Compare *Swanton,* in which the Court noted that there "was a market here but it was influenced somewhat by the company's buying of its own stock."

Second, the corporation contends that the value should be fixed at 13⅜ because that was the closing price on the day preceding the tender. I do not understand *Midland-Ross* to hold as a matter of law that the last day of trading on an open market is the measure of market value. It is true that the Court used the average of that day, but it stated quite specifically that its use was "for the purpose of * * * [that] proceeding."

It follows that the Appraiser's finding as to market value is reasonable under the circumstances and will be approved.

### C. Assets

I turn now to an aspect of value about which the parties differ most sharply: corporate assets. The stockholders contend that assets should be given a value factor of $20.53 per share, the corporation says the value should be fixed at 0, and the Appraiser came out with $16.38 per share.

At the time of merger Underwood's stock, on the corporate books, was under water by $2.11 per share. The Appraiser computed asset value by adding to net book two assets which had not been reflected on Underwood's books: the exclusive agreement for the distribution of Olivetti Italy products (assigned by Olivetti America to Underwood) and a tax loss carryover. He valued the distribution agreement at $14.68 per share, the tax loss carryforward at $3.81 per share, and, beginning with minus $2.11, he arrived at a total asset value of $16.38 per share. Both Olivetti Underwood and the stockholders disagree.

I first consider the distribution agreement which the Appraiser found to be a valuable, if not the most valuable, asset Underwood had.

Underwood got the agreement in 1960, along with the tangibles, in exchange for 1,200,000 shares of its stock. The day prior to stockholder approval of the transaction Underwood closed on the New York Stock Exchange at $45.575. When these two figures are put together, multiplied, the product is $54,690,000. In common language, that was the value of the deal when it was made. The Appraiser found that the tangible assets were valued on Underwood's books at $16,920,000. He concluded that the balance of $37,770,000 must have been the consideration for the distribution agreement. The Appraiser recognized the difficulties inherent in placing a value on such an asset, but he concluded that the most appropriate method of valuation under the circumstances was the consideration given for the agreement. He also determined that the value of the agreement had remained substantially the same down to the time of merger. Accordingly, he divided $37,770,000 by the total outstanding shares at the time of merger (2,572,577) and got the value of $14.68 per share which he used.

The stockholders object, contending that the share value should be $31.47. They apparently arrive at this figure by dividing the $37,770,000 by 1,200,000, the number of shares transferred to Underwood by Olivetti America. But shares transferred are irrelevant, because what is to be determined is the value of the shares at the time of merger. We are not concerned with "pricing" the Olivetti America-Underwood sale but rather with trying to determine what value should be added to each share of Underwood stock outstanding at the time of merger, for the reason that the agreement was a corporate asset. And for that purpose all shares must be counted. Merely deducting $14.10 from $45.575 (as the stockholders do in their brief) is not pertinent for the same reason: it does not reflect total shares outstanding at the time of merger. Accordingly, the Appraiser's computation in this respect is correct.

Olivetti Underwood objects on several grounds: first, it was error to use the value of Underwood's stock as a basis for determining the value of the agreement, because the stock fluctuated in price; second, if the value of the stock is used it should be the value on the date of merger or, alternatively, at the time when management approved the transaction; fourth, the Appraiser did not consider properly amortization or depreciation of the agreement; next, the agreement had no value at the time of merger since Underwood was then "technically insolvent;" and the Appraiser disregarded testimony that the agreement had no value at the time of the merger.

For reasons which are understandable, the parties rely little on authority or case law; the issue comes down to what is fair and reasonable under the special circumstances of the case.

All parties agree that at the time of assignment the agreement had a substantial value, and all seem to agree, tacitly, that it is difficult to determine its true value for present purposes.

■ I am satisfied that the method followed by the Appraiser is the most appropriate under the circumstances. He determined that the value of the agreement was most closely related to the price Underwood paid for it. The Board of Directors, in submitting Olivetti America's offer to the stockholders for approval, stated that they deemed the offer fair. Admittedly, they did not know at that time what price Underwood would pay, because that was to be fixed on the basis of market value of Underwood stock on the day preceding stockholder approval. However, when the stockholders voted to approve the offer they had all the facts and ratified the judgment of the Board that the offer was fair. Under the circumstances, both the Board and the stockholders should be presumed to have exercised sound business judgment by giving fair value for what they got

(and not wasting corporate assets by giving more than they were getting).

▮ When the Board of Directors and the stockholders of Underwood approved the agreement it was anticipated that the company would continue to operate at a loss for several years; the proxy statement for the meeting specifically referred to anticipated losses until the operation of both entities was "fully integrated and for some time thereafter." One of the purposes of the acquisition was to increase sales, and that hope was realized; in this respect the distribution agreement was instrumental in improving the financial condition of Underwood. And although at the time of the merger Underwood was technically insolvent, the distribution agreement continued to have substantial value in light of its subject matter, its time period and the public commitment of the Olivetti interests to Underwood. As to the date of valuation the time of stockholder approval was, in the last analysis, the critical time for the transaction itself and I think the Appraiser was right in using it here.

▮ The Appraiser determined that at the time of merger the agreement had the same value as at acquisition. He did not consider amortization because he felt it was a question *de minimus*. But Olivetti Underwood's argument shows that by applying a conservative straight-line amortization formula (over the 25-year life of the agreement), the per share value of $14.68 arrived at by the Appraiser would be reduced by $1.95 per share. Such a deduction seems consistent with the general approach taken by the Appraiser and I think it should be made. Accordingly, to this extent the Appraiser's valuation will be modified.

I turn now to the tax loss carryforward. The Appraiser found that Underwood's accumulated losses exceeded $57,000,000 and that the maximum theoretical value of this loss for tax purposes was roughly $30,000,000. The witness offered by the stockholders on this issue discounted the theoretical value by about one-third. And,

making a more conservative judgment, the Appraiser discounted it by approximately two-thirds, and so assigned a value of $10,000,000 to the tax loss. Both the stockholders and Olivetti Underwood say that he was wrong.

The stockholders' argument, simply stated, is that their witness valued the loss at some $20,000,000 and that figure should be accepted. Olivetti Underwood makes many contentions: It says, among other things, that the stockholders' witness was not qualified to give the opinion which he expressed and, under Delaware law, if there is no reasonable expectation that the company whose assets are being appraised could have used the tax loss carryforward, it is not an asset for appraisal purposes. It also contends that there is nothing in the record to support the dollar value reported by the Appraiser.

I first consider Delaware law. Olivetti Underwood argues that the tax loss carryforward is an "accomplishment" resulting from the merger and its inclusion for valuation purposes is not permitted by the statute, 8 Del.C. § 253(e), which provides that the value to be paid to a person objecting to the terms of the merger is: " * * * the value of his stock on the date of the recording of the certificate of ownership and merger, exclusive of any element of value arising from the expectation or accomplishment of said merger."

I regard Tri-Continental Corporation v. Battye, supra, as authorizing the inclusion of a tax loss carryforward as a value factor in an appraisal proceeding. Thus, Justice Wolcott, writing for the Supreme Court, spoke of the "favorable tax situation * * * found by the appraiser"; and that "favorable tax situation resulted from realized losses * * * and loss carryovers which would have enabled" the corporation to take certain profits without taxes. Compare Levin v. Midland-Ross Corporation, supra.

But that principle has no application here. I say this because the Appraiser did not

make a finding of an earnings trend toward a profit which would have enabled it to use any of the tax loss. At most he said that the earnings trend "seemed to be pointing in that direction." His report indicates that he assigned value to the loss, not because it would enable Underwood to take anticipated profits from earnings without taxes, but because of its value in acquisitions or similar undertakings. And I note that the stockholders in their brief rely entirely on that aspect of the case in attempting to secure a valuation for the tax carryforward.

Olivetti Underwood argues that the carryforward, in a merger context, is not a value factor which may be considered in appraisal proceedings, but I do not have to reach that question in this case. I say this because, assuming the factor to be relevant, I am satisfied that the record does not support the reliance which the Appraiser apparently placed upon the expert witness offered by the petitioning stockholders. In saying this I limit my comments to his testimony about valuation of the tax loss carryforward.

The witness has been engaged recently in private practice as a tax consultant after many years of association with a brokerage firm where he was a Supervisor Security Analyst and head of its tax department. Unquestionably, he has had experience with and is competent in tax matters. And his testimony shows some familiarity with the mechanics of applying tax losses in corporate accounting. But the short of it is the record does not lay a foundation for the testimony which he gave on the crucial question: the *valuation* of the tax loss carryforward.

We are concerned here with losses approaching $60,000,000 which are usable for tax purposes under highly technical statutory and regulatory conditions; the existence of the losses, the amounts thereof and how they are "used" are all unquestionably germane to certain proposed corporate combinations (whatever the legal procedure may be). But the record fails to show that the witness had knowledgeability, skill, experience or know-how about the *valuation* of tax losses in transactions of this kind, whether in this or any other dimension. In short, he lacked the expertise called for on the valuation issue. And he really did no more on the crucial point than to state that "you could put a value on it of $20,000,000 to $25,000,000." There was almost no explanation of how he arrived at this valuation which he offered the Appraiser. There were no calculations (apart from the 52% tax rate), no analogies, no reference to comparables, no analysis or weighing of the factors (legal, accounting or financial) which would play a part in arriving at a $20/25,000,000 valuation. In brief, there was no foundation for the key opinion he gave. And that opinion, according to his own testimony, was a "theoretical value" which, he said, " * * * is considered a reasonable figure, that's all" and "there is no way to appraise it." I agree. Thus for two reasons, the absence of both personal qualification and record foundation for the opinion, the testimony is not acceptable.

It follows that I do not approve the recommendation or the conclusion of the Appraiser with respect to the tax loss carryforward; accordingly, his report will be modified by the reduction of $3.81 per share from the value that he assigned to assets.

### D. Weight

Finally, I turn to the question of what weight is to be assigned to the value factors. As the Supreme Court observed in Application of Delaware Racing Association, supra, there is no precise criteria to be applied. And on this record I find that I differ somewhat from the Appraiser, more in degree than in principle. Before stating my conclusions as to weight, it may be useful to refer, at least generally, to some aspects of the case which I have considered.

First, earnings are to be weighted as a factor although there were none. Ap-

plication of Delaware Racing Association, supra, and Adams v. R. C. Williams & Company, 39 Del.Ch. 61, 158 A.2d 797 (Ch. 1960). Second, I agree with the Appraiser that once Olivetti Italy became committed to Underwood there was a significant change in its prospects which tends to reduce the emphasis upon asset value. Third, the stock was traded on the New York Stock Exchange until June 1963; market-pricing is not controlling here, but I think it is worthy of high weight because, in the long run as in *Delaware Racing*, market would be the most likely way in which an investor in Underwood stock (had he been permitted to hold shares) would have realized something on his investment. And my best judgment is that the Olivetti support would have been reflected in the pricing.

My conclusion as to weighting the factors is as follows: earnings, 25%; market, 50%; assets, 25%. The intrinsic value of a share of stock of Underwood Corporation on the date of merger is therefore determined to be as follows:

| Value Factor | Value | Weight | Result |
|---|---|---|---|
| Earnings | $ 0 | 25% | $ 0 |
| Market | 14.25 | 50% | 7.125 |
| Assets | 10.62 | 25% | 2.655 |
| | | Value per share | $9.78 |

Order on notice.