**In the Matter of the Application of VISION HARDWARE GROUP, INC., a corporation of the State of Delaware, for a Determination, Pursuant to Section 262 of the General Corporation Law, of the Value of Certain Shares of the Stock of its Predecessor, Better Vision Hardware Group, Inc.**

No. 13385.

Court of Chancery of Delaware,
New Castle County.

Submitted: April 12, 1995.
Decided: July 26, 1995.

---

672

R. Franklin Balotti, Daniel A. Dreisbach, and Todd C. Schiltz, of Richards, Layton & Finger, Wilmington (Sheila Mosmiller Vidmar, Esquire, of Piper & Marbury, Baltimore, Maryland, of counsel), for Vision Hardware Group, Inc.

David A. Jenkins, of Smith, Katzenstein & Furlow, Wilmington, for Respondents.

ALLEN, Chancellor.

This appraisal action raises the following issue: in determining the "fair value" of the shares of a company, under Section 262 of the Delaware General Corporation Law, does one value debt owed by the company at its book value or at a market value. Actually the evidence raises this issue in a narrowed form: where the company itself is on the brink of bankruptcy and without ability to refinance its debt, how should its debts be valued for appraisal purposes. As set forth below it is my opinion that where the company is not financially able to refinance its debt (and thus itself realize some value from the spread between the market value of its debt and the face amount of the legal liability), is insolvent and on the verge of bankruptcy, the appraisal value of its stock, insofar as affected by its debts, is determined by reference to the amount of its legal liability to pay its debt.

### I.

The case has been tried. The facts appear to be as follows.

On November 30, 1993, a merger was effectuated between Better Vision Hardware Group, Inc. ("Better Vision") and New Better Vision Hardware Group, Inc. ("NBVH"), a wholly owned affiliate of Trust Company of the West ("TCW"). TCW had recently acquired from Better Vision's banks and other institutional investors substantially all of the outstanding non-trade debt of Better Vision and warrants exercisable into voting stock representing 51% of the Better Vision's outstanding shares. The warrants were exercised in connection with authorization of the merger. In the merger all of the outstanding stock of Better Vision not owned by TCW was converted into the right to receive $125,000 to be distributed *pro rata*.[1]

Twenty-one holders of Better Vision common or preferred stock dissented from the merger and sought their statutory right to an appraisal of the fair value of their stock pursuant to Section 262 of the Delaware General Corporation Law. On February 18, 1994, Better Vision itself petitioned for this

---

1. See Section II for per share price of different    classes of stock.

appraisal proceeding to determine which of these shareholders had satisfied the statutory predicates to an appraisal and to determine the fair value of Better Value shares, exclusive of any element of value arising from the merger itself. Having decided that all of the dissenting shareholders except Mr. Dennis Blake are entitled to an appraisal, the matter was tried on April 11 and 12, 1995.

For the reasons set forth below, I find, upon consideration of all relevant factors, that the common stock of Better Vision had essentially no financial value at the time of the merger; the amount paid in the merger represented "nuisance value" and exceeded the fair value of the public shares prior to the merger.

## II.

Better Vision is a holding company that owns Vision Hardware, Inc. ("Vision"), which in turn is the sole shareholder of three operating companies in the "do-it-yourself" hardware business: The Union Fork and Hoe Company; VSI Fasteners, Inc.; and McGuire–Nicholas Company, Inc. Better Vision was formed in 1988, to accomplish a series of highly-leveraged buyouts including these three businesses. Following those transactions, Better Vision was highly leveraged. It had total debt in excess of $182 million, on a consolidated basis. According to the testimony of Better Vision's chief fi-

nancial officer the petitioners contributed some $500,000 in equity.

Better Vision had pledged substantially all its assets to secure the senior indebtedness that financed these acquisitions. Servicing its debt obligations, however, proved impossible, as its revenues proved to be insufficient. Indeed, Better Vision never enjoyed a profitable year. It had a net loss of $2.9 million in 1989; of $25.5 million in 1990; of $36.7 million in 1991;[2] of $7.6 million in 1992; and a projected net loss of $68.5 million for 1993.[3]

These poor business results forced Better Vision to approach its lenders in order to restructure its debt in 1991. Better Vision's creditors agreed to convert some subordinated debt to equity in the Vision Hardware subsidiary and to extend the terms of the loans; the 1991 restructuring, however, left Better Vision with a complicated capital structure.

Following the 1991 renegotiation, Better Vision had approximately $126 million in senior debt outstanding.[4] These loans were secured by all the assets of Vision pursuant to the various credit agreements. The subordinated debt, much of which had been converted to Vision preferred stock in the 1991 restructuring, followed in the order of priority. The subordinated debt amounted to about $15 million.[5] Financial covenants allowed the subordinated debt holders and senior preferred shareholders to take control of

---

**2.** Although Better Vision's financial statements indicated net profits of $632,000 for the fiscal year ending July 31, 1991, it actually had net losses before extraordinary events amounting to $36.7 million. The sole reason for the stated "profits" was to its gain on debt restructuring in 1991.

**3.** The Company had income from operations of $23,574,000 in 1989; $6,668,000 in 1990; $10,-219,000 in 1991; $8,961,000 in 1992; and $10,-277,000 in 1993. But after servicing its debt, it incurred net losses in every year of its operation, and was in default on some of its loans.

**4.** The principal amount of the senior debt held by each bank was:

| | | | |
|---|---|---|---|
| The Bank of California | $10,441,185.24 | Security Pacific National Bank | $13,921,580.37 |
| CIBC, Inc. | $13,921,580.37 | U.S. National Bank of Oregon | $ 6,960,790.25 |
| Citicorp | $55,686,321.46 | Western Savings & Loan Associ- | |
| HomeFed Bank, F.A. | $17,401,975.49 | ation | $ 7,441,566.82 |

**5.** The subordinated debt holders and the amounts that they held were as follows:

| | |
|---|---|
| BancBoston Capital Inc. ("Banc-Boston") | $6,100,000 |
| Federal Deposit Insurance Corp. ("FDIC") | $7,625,000 |
| Teachers Insurance and Annuity Association of America ("TIAA") | $1,525,000 |

As mentioned, the subordinated debt holders converted some of their debt into Vision equity. Vision issued preferred stock with BancBoston holding 98,104.15 shares, TIAA holding 116,-536.98 shares and the FDIC holding 352,745.22 shares.

Better Vision in certain circumstances in the event of a default. Warrants exercisable at $.01 per share were issued to the same preferred shareholders permitting them at their election to acquire 75 percent of the common stock of Better Vision.

By the fall of 1993, Better Vision had simply run out of cash and was in default to its bank lenders. An internal memorandum by one of the lenders summarized Better Vision's situation as of November 1993:

> ... the Group cannot support its current debt burden. The Company missed its $4 [million] bank amortization due last August and, based on revised projections, cannot amortize much debt going forward. During 1993, the Group had to supplement $12 [million] in EBITDA with revolver drawdowns in order to cover $10 [million] in interest expense, a $2.8 [million] principal payment to the banks and [$900,000] in capital expenditures. By September, the $30 [million] bank revolver was fully drawn.

The seasonality of Better Vision's various markets further exacerbated its financial condition in the fall of 1993. A large part of Better Vision's business was in garden and lawn care. This market required heavy capital expenditure during the winter months to build up inventory for the spring sale season. Better Vision's CFO estimated that the Company required $8 to $10 million in additional cash to get through the winter season of 1993. Better Vision was paying its invoices as cash was coming in the door, giving discounts to receive payments on accounts receivable sooner, keeping inventories at a minimum, and denying requests for capital expenditures and new equipment. Even with these techniques to squeeze credit from its suppliers and receive cash more quickly, accounts payables were running 30 to 90 days past due.

Debt service was consuming nearly all of the Company's cash flow from operations. More importantly, its financial projections indicated that Better Vision would not have adequate cash to service its loans in the future. Approximately $5 million in principal and $5 million of after-tax interest cost was to come due in fiscal 1994; the Company projected only $4 million cash flow for that period. In 1995, Better Vision would be required to make a $106 million principal payment; its projected cash flow for that year was $10 million. This situation required the Company to again approach its lenders for another debt restructuring.

Anticipating that it would soon encounter difficulties servicing its debt, in early 1993, Better Vision retained the services of Ernst & Young to assist it in trying to solve its cash-flow and debt problems. Negotiations between Better Vision and its creditors looking towards further extensions of credit proved fruitless, however. Not only had Better Vision never made a profit but it had virtually no assets that were not already pledged to secure the Company's senior debt. It thus became very clear that existing senior creditors were unwilling to make new financial commitments that were necessary to keep the Company operating. Consequently, in October 1993 the Company began preparing for what seemed unavoidable, bankruptcy, by engaging special bankruptcy counsel.

TCW was one of Better Vision's creditors looking for a way out of a bad and deteriorating situation. In the fall of 1993 Mr. Matt Barrett of TCW approached the representative from Citibank, the lead lender, for its reaction to a TCW proposal to purchase all of Better Vision's outstanding senior and subordinated debt as part of a plan to advance additional credit. As TCW's plan appeared to present the only available opportunity for Better Vision to avoid the various costs of bankruptcy, it received a positive response from Better Vision's other senior lenders.

TCW's proposal entailed TCW acquiring all of Better Vision's senior and subordinated debt and all of Better Vision's preferred and common stock. In addition, as the only creditor/owner, TCW would provide a $12.5 million cash infusion to Better Vision so that its operating companies could build up the needed inventory during the winter months.

After extended negotiations with Better Vision's senior creditors, TCW reached an agreement to purchase all of the senior and

subordinated debts at deep discounts.[6] Each of the agreements to purchase the debt included an agreement to sell or assign (for little or no additional consideration) warrants acquired by the senior debtors. Closing was in all events contingent upon TCW acquiring sufficient number of shares to effect a merger and cash out the equity of Better Vision.

Next TCW sought the approval of the Company of its proposed merger and cash out of the old shareholders. On the theory that the existing equity had essentially no financial worth, TCW's initial proposal provided for an aggregate payment of $150,000 to the Better Vision stockholders. Mr. Bradley Scher of TIAA, however, refused to agree to the sale of TIAA's subordinated debt if the shareholders, whose shares he considered to have only nuisance value, were to be paid more than $125,000. To Mr. Scher whose debt (plus accrued interest) was proposed to be sold for fifty cents on the dollar, only by paying the shareholders an aggregate sum of no more than $125,000 would the "relative fairness of the deal" be established. Otherwise, Mr. Scher wanted ten times the additional $25,000 proposed to pay the shareholders in order for TIAA to go along with the proposed transaction.

As TCW would not/could not pay TIAA more, the proposal presented to Better Vision's board included an aggregate payment of $125,000 to the Company's shareholders. Better Vision's board and management met with Ernst & Young representative Ken White on November 5 and on November 8 to discuss TCW's proposed merger, the Company's financial situation, and alternative sources of financing. By the November 8th meeting, it had become apparent to the board that time had run out for Better Vision to structure another transaction that could save the Company from the impending bankruptcy.

On November 8, 1993, the board of directors approved the proposed agreement of merger by a vote of four to one.[7] Under the merger agreement, holders of 2.8 million Class A common shares outstanding were to receive $15,417 in the aggregate or $.0555 per share; holders of 1.6 million Class B common shares were to receive $26,250 in the aggregate or $.0164 per share; and holders of 3.5 million 6% junior preferred shares were to receive $83,333 in the aggregate or $.02525 per share.

The merger agreement specified that the merger was contingent upon TCW closing on its contracts to acquire the senior debt, the subordinated debt, certain preferred stock and warrants.[8]

On November 15, 1993, TCW acquired the following senior debt pursuant to the merger agreement:

| Lender | Face Value | Purchase Price |
|---|---|---|
| Citibank | $50,097,714.07 | $28,555,697.02 |
| CIBC | $12,745,230.98 | $ 7,264,782.66 |
| Hokkaido | $ 3,339,958.82 | $ 1,903,605.53 |
| MONY | $ 7,022,647.24 | $ 4,002,908.03 |
| GIPEN | $ 4,681,764.84 | $ 2,668,606.96 |
| Total: | $77,887,315.95 | $44,395,600.20 |

6. Since October 1992, TCW had been acquiring the Company's senior debt. TCW purchased for $1,801,088 the $7,204,351 in principal amount held by the Resolution Trust Corporation ("RTC") as receiver for Western Savings & Loan Association. In November 1992, TCW acquired for $5,614,639 the $17,545,731 in principal amount held by the RTC as receiver for HomeFed Bank, N.A. In December of that year, TCW paid $4,938,327 for the $12,995,598 in principal amount owned by Bank of America. TCW acquired $9,522,435 in senior debt held by Bank of California in May 1993 for $3,618,525.

7. Respondent Dale Young was the dissenting director. He owned 20,224 shares of the Company's class B common stock and 100,000 shares of junior preferred stock, and sought $500,000 for the shareholders.

8. Similarly, the purchase agreements executed between TCW and the senior debt holders—Citibank, CIBC, The Mutual Life Insurance Company of New York ("MONY"), GIPEN & Co. ("GIPEN") and Hokkaido Takushoku Bank, Ltd. ("Hokkaido")—memorialized the contingent nature of these sales. The purchase agreements expressly conditioned TCW's agreement to proceed to closing upon the following: (1) TCW entering into the merger agreement which converted the junior preferred and common stock of Better Vision into the right to receive cash; (2) the acquisition by the Company of the FDIC's interests; and (3) the execution by TCW of agreements to acquire the Company's senior preferred stock, the subordinated notes, the Class A, B and C preferred stock, and the outstanding warrants.

TCW also paid the following amounts in November 1993 to the subordinated debt holders and senior preferred shareholders:

| Lender | Face Amount/Type of Interest | Price TCW Paid |
|---|---|---|
| Bank of Boston | $4,000,000 sub debt<br>$2,100,000 accrued interest<br>111,943 shares of BVHG 9% Senior Preferred<br>77,574.15 shares Class A Preferred<br>20,530.00 shares Class B Preferred<br>4,721,739 common stock warrants<br>An indeterminate number of shares of Class C Preferred | $1,750,000.00 |
| TIAA | $1,000,000 sub debt<br>$525,000 accrued interest<br>46,925.70 shares Class A Preferred<br>69,611.28 shares Class B Preferred<br>27,985 shares BVHG 9% Senior Preferred<br>2,895,652 common stock warrants<br>An indeterminate number of shares of Class C Preferred | $ 750,000.00 |
| J.P. Morgan | 69,965 BVHG Senior Preferred<br>137,200 common stock warrants | $ 150,000.00 |
| | Total: | $2,650,000.00 |

The Company paid the following amount to the FDIC in November 1993: [9]

$5,000,000 sub debt
227,088.48 shares Class A Preferred
125,656.74 shares Class B Preferred
4,903,435 common stock warrants
An indeterminate number of shares of Class C Preferred (issued as interest).    $ 200,000.00

Mr. Barrett, the TCW executive who negotiated this transaction, testified that Bank of Boston and TIAA, the subordinated debt holders, when selling the subordinated debt claims, "thr[ew] in their preferred stock and warrants for free." Similarly, J.P. Morgan, another subordinated debt holder, according to the record, transferred 137,200 common stock warrants to TCW and just canceled its remaining 2,993,235 common stock warrants. Once TCW acquired the warrants from the subordinated debt holders, it exercised the right to purchase 7,754,591 shares of Class A common stock; TCW paid Better Vision $77,-546 to exercise the warrants. This number of shares allowed TCW to have sufficient votes to authorize the merger.

On November 3, 1993, TCW created a Delaware corporation, New Vision Incorporated, ("New Vision"), and a wholly owned subsidiary NBVH for the purpose of effectuating the merger. On November 30, 1993, after all of the conditions of the merger agreement were satisfied, the TCW affiliate, NBVH, merged into Better Vision, with Better Vision as the surviving corporation. All Better Vision shares, except those held by NBVH (which were canceled) were converted into a right to receive cash.

### III.

█ The principal issue presented is how one values the debt of a financially strapped company that is on the brink of bankruptcy for purposes of Section 262. Both of the experts presented by the parties employed the discounted cash flow technique to estimate the enterprise value of the Company.[10] The inputs for the discounted cash flow models used by the experts varied. Nevertheless, the outcomes of their analyses were not vastly dissimilar. Mr. DiNapoli, the Company's expert, estimated the Company's enterprise value immediately before the merger to be approximately $86 million and within a range of $82 to $102 million. Shareholders' expert Mr. Kevin Dages' valuation of $95.9 million falls within that range. The two experts markedly diverged, however, in their opinions of the valuation of Better Vision's outstanding debt at the time of the merger. Mr. DiNapoli testified that, in this context, the appropriate valuation of the Company's senior debt was its face amount or $115.8 million and $10 million for the subordinated debt. As the value of the senior debt alone exceeds his estimate of the value of the enterprise, Mr. DiNapoli concluded that Better Vision's equity had no value.

---

9. While, technically, the Company purchased the FDIC's interest, it was required to borrow the money from TCW, and thus, indirectly, TCW paid this amount.

10. Enterprise value as used by the witnesses in this case is an estimate of the value of the company without considering the existence of liabilities used to finance it.

Mr. Dages, on the other hand, was of the view that the deduction from enterprise value for debt should be estimated by using the market value of the debt. Mr. Dages claimed that the prices paid by TCW (and in some instances by Citibank) to purchase Better Vision's senior and subordinated debts were reliable indications of the market value. As the total price paid by TCW for all of Better Vision's senior and subordinated debts amounted to approximately $56 million, Mr. Dages calculated the going concern value of Better Vision to be $39.9 million ($95.9 million of enterprise value less $56 million of debt) or $2.54 per share of common or junior preferred stock.

## IV.

■ The objective of this appraisal proceeding is to provide the dissenting shareholders the value of their shares at the time of the merger from which they dissented, affording them, however, no "element of value arising from the accomplishment or expectation of the merger." 8 *Del.C.* § 262(h). In doing so the Delaware courts will attempt to value the whole enterprise as a going concern, *Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137, 141 (1980) and will afford dissenting shareholders their pro-rata portion free of any "minority discount." All relevant factors are to be considered in such valuation. *See* 8 *Del.C.* § 262; *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 713 (1983).

■ Generally, since shareholders are entitled to their proportionate share of the synergies created by the current deployment of assets and the good will of the firm, in determining the fair value of stock, even for financially troubled companies such as Better Vision, the court appraises such stock on a going concern and not on a liquidation basis. *In re Olivetti Underwood Corporation*, Del. Ch., 246 A.2d 800, 803 (1968); *see Tri–Continental Corporation v. Battye*, Del.Supr., 74 A.2d 71 (1950). But this principle is usually applied in a setting in which, but for the merger, there would still *be* a going concern.

In this instance the evidence shows conclusively that but for the TCW proposal and its effectuation, Better Vision was a going concern heading immediately into bankruptcy and, unless new credit was made available, liquidation. This fact has very basic importance in determining the fair value of Better Vision stock.

After considering all credible admissible evidence, I find that Better Vision, on November 30, 1993, was an insolvent company that was in default on substantial obligations, with even greater obligations falling due in its immediate future. It was on the precipice of bankruptcy. Clearly the Company was in desperate need of a rescue effort, which was not forthcoming. Without TCW's proposal, it was highly likely that Better Vision would have been forced into bankruptcy, where, in these circumstances, its shareholders would have been unable to extract much value.[11] Thus, although the inquiry in an appraisal proceeding is to determine the fair value of a company on a going concern basis, and not on a liquidation basis, the pertinent question is what was the going concern value of this particular company on November 30, 1993. As a company to be appraised moves closer to the lip of liquidation, the line between going concern basis and liquidation basis becomes ever finer. That is, financial differences between the results of these different types of analysis will grow smaller as the company moves close to forced liquidation.

Of course, there may be circumstances where the debtor company and its shareholders may benefit from the debtor company's inability to repay the full amount of its outstanding debt. For example, the debtor company may have access to capital (perhaps with assets that have not been already pledged) and can retire its outstanding debt at discounts from its face value or can refinance it. But such is not this case. Better Vision had exhaustively sought alternative financing but to no avail. It did not have adequate cash to buy its required inventory much less buy down or refinance its debt. Thus, the Company was in no position to

11. *See* LoPucki & Whitford, *Bargaining Over Equity's Share In Bankruptcy Reorganization of* *Large, Publicly Held Companies,* 139 U.Penn. L.Rev. 125 (1990).

take advantage of its bleak financial condition.

The record demonstrates that without new capital Better Vision was on a track leading to further losses and ultimately liquidation. Better Vision was saved from that fate only by TCW's proposal under which TCW purchased all of the outstanding debt of the Company at deep discounts and advanced new money to the firm. The creditors who financed the original 1988 transactions have now lost on the order of half of their investment. The dissenting shareholders, who invested only about $500,000 in 1988, now claim their investment has a fair value of $15 million. This anomalous but striking financial performance is said to have occurred in an investment in a company that never made a profit!

One way to understand the position of the dissenting shareholders is that they claim that the creditors of Better Vision—who held debt which the dissenters claim was worth $56 million—would ultimately have been forced to agree to a re-financing of the debt to a much lower face amount and that in that process the recognition of loss by the lenders would result in the realization of gain by the holders of equity. The problem is that the evidence does not show that it is likely that the lenders would be forced to refinance the company by writing off a major part of the legal liability that they were owed. To the contrary the holder of the debt by the time of the merger (TCW) had the right to enforce the legal liability and to force the company into liquidation. It was willing to advance substantial funds necessary to avoid liquidation only on the basis of the cash out merger. There is no evidence that greater value could be achieved by the stockholders on any other available alternative.

The shareholders' view that their stock was worth more than $2.00 per share is sharply at odds with the actions of the sophisticated lenders who owned shares and warrants. In the transactions between the subordinated debt holders (the FDIC, Banc-Boston, TIAA and J.P. Morgan & Co.) and TCW, the subordinated debt holders threw in their "preferred stock and warrants for free." These warrants were convertible *to* over 15 million shares of common stock representing about 75 percent of the equity in the Company. Although they were freely exercisable, the subordinated debt holders decided to transfer these warrants to TCW or just cancel them. These actions by the financially sophisticated subordinated debt holders represent a clear indication that they believed that the common stock of Better Vision was worthless.

Plaintiffs cite *In re Olivetti Underwood Corporation,* Del.Ch., 246 A.2d 800 (1968) for the proposition that a "technically insolvent" company can have material value. Of course that is true, but of no help on these facts. In *Olivetti* the court found that a company which had net losses for seven consecutive years prior to the merger which gave rise to the appraisal action had a fair value of $9.78 per share. *Id.* at 805. The *Olivetti* court noted that the company's stock was traded on the New York Stock Exchange at $14.25 per share prior to the merger and that the company had an asset worth over $37 million that was not reflected on its financial statements.

Of course, one can easily imagine instances where equity would continue to have value even though the corporation was insolvent in the sense of being unable to pay obligations when due. But as the relevant question is the value of *this* insolvent company at the time of its merger with TCW, I conclude that such a generalization is of no help to plaintiffs.

Finally, the shareholders note that the Delaware Supreme Court has acknowledged the appropriateness of using the market value of the company's debt in appraising the fair value of its stock. *Rapid–American Corp. v. Harris,* Del.Supr., 603 A.2d 796 (1992). Due to changes in interest rates, the outstanding debt was recorded in the company's financial statements at its market value of $356,154,-000, rather than its face amount of $652,589,-000. In affirming the trial court's reliance on the market value of the debt rather than the face amount, the Supreme Court stated that the trial court "was free to consider the realities of the market place in its evaluation of [the company's] intrinsic value." *Id.* at 804. Indeed when the corporation is not

heading imminently for bankruptcy, I suppose that more typically the better valuation technique will be to value corporate debt at its market value if that can be established. But that technique is not appropriate in this case, where, but for the merger, there will be no on-going business for long and (to refer to the same fact differently) the corporation has itself no means to seize any of the value represented by the discount of its debt.

*     *     *

For the foregoing reasons I conclude that on the facts of this case the appropriate valuation of the company's debt, for purposes of Section 262, is the dollar value of the legal claim that that debt represented. Thus, I conclude that the shares held by the public shareholders excluding value attributable to the merger and its cash infusion, had no substantial value. They had nuisance value no greater than the amount paid in fact.

Petitioner may submit a form of order on notice.